**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| SOURCEAMERICA, and | ) |
| | ) |
| LAKEVIEW CENTER, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF EDUCATION, | ) |
| | ) |
| UNITED STATES DEPARTMENT OF THE ARMY, | ) |
| | ) Civil Action No. _____ |
| UNITED STATES DEPARTMENT OF DEFENSE, | ) |
| | ) |
| BETSY DEVOS, in her official capacity as Secretary of Education, | ) |
| | ) |
| RYAN D. McCARTHY, in his official capacity as Acting Secretary of the Army, and | ) |
| | ) |
| JAMES MATTIS, in his official capacity as Secretary of Defense, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Federal contracts for dining facility attendant services at military dining facilities are not subject to the Randolph-Sheppard Act ("RSA").  Pursuant to Congressional directive, the U.S. AbilityOne Commission, U.S. Department of Education, and U.S. Department of Defense

agreed that dining facility attendant services fall under the exclusive purview of the Javits-Wagner-O'Day Act ("JWOD Act").

2.      The Javits-Wagner-O'Day Act implemented what is now known as the U.S. AbilityOne Program, to provide employment opportunities for individuals who are blind or have significant disabilities through manufacturing commodities or performing services for the Federal Government.  Plaintiff Lakeview Center, Inc. ("Lakeview") is a nonprofit entity that employs individuals with significant disabilities.  The U.S. AbilityOne Commission designated Lakeview as the qualified "Mandatory Source of Supply" of dining facility attendant services for the U.S. Department of the Army at an active military installation in Fort Riley, Kansas. Accordingly, the Javits-Wagner-O'Day Act statutorily required the Army to procure dining facility attendant services at Fort Riley from Lakeview.

3.      Plaintiff SourceAmerica is a designated "central nonprofit agency" under the AbilityOne Program and, in that statutorily-prescribed role, represents and facilitates the distribution of contracts to Lakeview and other qualified nonprofit agencies that employ individuals with significant disabilities.  Providing employment opportunities to individuals with significant disabilities is the core mission of both SourceAmerica and Lakeview.

4.      Displeased with the Army's procurement of dining facility attendant services from Lakeview and not its preferred vendor, the Kansas Department for Children and Families (the "Kansas Agency")—a state agency designated by the Department of Education to help operate the Randolph-Sheppard Act, a separate program for vending facilities on federal property—initiated a Randolph-Sheppard Act arbitration with the Department of Education to challenge the Javits-Wagner-O'Day Act's applicability.

5.      Despite Lakeview's entitlement to the dining facility attendant contract—pursuant to an agreed-upon policy, the Army's procurement decision, and the AbilityOne Commission's designation of Lakeview as the "Mandatory Source of Supply" for the dining facility attendant services via formal notice and comment—the arbitration panel simply ignored multiple intervention requests by SourceAmerica and Lakeview, who were necessary parties, over an eight-month period.   As a result, the arbitration panel prevented these essential third party beneficiaries of the AbilityOne Program from defending Lakeview's entitlement to the Fort Riley contract.   Then, for the first time at the arbitration hearing itself, the panel summarily denied SourceAmerica and Lakeview even the ability to be heard—much less adequately protect their interests in the Fort Riley contract—in violation of the Fifth Amendment of the United States Constitution and Section 555(b) of the Administrative Procedure Act.

6.      The arbitration panel then issued a decision that the dining facility attendant services fall under the Randolph-Sheppard Act.   This decision denies Lakeview the contract and ensures that the Army will award dining facility attendant contracts to the Kansas Agency's preferred vendor instead.   The decision further conflicts with the plain text of both the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act.   What's worse, the arbitration panel rendered the decision without jurisdiction and in violation of the United States Constitution, which prohibits the delegation of inherently legislative and judicial authority to a panel of private citizens.

7.      General David P. Carey—who served on the three-member arbitration panel— dissented and rejected the Kansas Agency's "overly broad interpretation" of the Randolph-Sheppard Act on the merits; determining that the Javits-Wagner-O'Day Act properly applies to

dining facility attendant services.  In other words, Lakeview should receive award of the dining facility attendant contract at Fort Riley.

8.      In a remarkable passage from his dissent, General Carey further concluded, "based [on] [his] own observations," that the arbitration proceedings "lacked fundamental fairness"—citing the wholesale exclusion of relevant testimony from SourceAmerica and Lakeview and the Army's concerns about "the Panel Chair's judgment, neutrality, and ability to assure a fair hearing."  Accordingly, General Carey would not only have granted the Army's request for a new arbitration hearing, he "would recommend to the Department of Education that an entirely new arbitration panel be appointed."

9.      For the reasons set forth in greater detail herein, the arbitration decision is arbitrary, capricious and contrary to law under the Administrative Procedure Act and must be vacated.  Similarly, the Army's subsequent failure to award the dining facility attendant contract to Lakeview as a consequence of the arbitration decision is also arbitrary, capricious and contrary to law.

10.      Because the arbitration decision continues to impose serious and irreparable harm to SourceAmerica and Lakeview, this Court should stay, declare unlawful, and vacate the arbitration decision, and enjoin its implementation and enforcement.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  The SourceAmerica and Lakeview causes of action arise under the laws and Constitution of the United States, including the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.*, the Randolph-Sheppard Act, the Javits-Wagner-O'Day Act, and the Fifth Amendment of the United States Constitution.

12.     Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(e) because Plaintiff SourceAmerica resides within this district.   Moreover, the AbilityOne Commission resides in this district and a substantial part of the events giving rise to this action, including but not limited to the process by which the dining facility attendant services at Fort Riley were added to the Procurement List, with Lakeview as the "Mandatory Source of Supply," occurred within this district.

13.     The arbitration decision constitutes "final agency action," which SourceAmerica and Lakeview timely appeal.   20 U.S.C. § 107d-2(a); *see also* 5 U.S.C. § 704.   The arbitration decision determines SourceAmerica and Lakeview's legal rights and obligations with respect to the Department of the Army's procurement for dining facility attendant services at Fort Riley, Kansas.

14.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief.   28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706.

**PARTIES**

15.     SourceAmerica is incorporated in Washington, D.C. with its headquarters and principal place of business in Vienna, Virginia.   SourceAmerica's address is 8401 Old Courthouse Road, Vienna, Virginia 22182.   SourceAmerica is a nonprofit entity designated as a "central nonprofit agency" for the AbilityOne Program—a role defined by the Javits-Wagner-O'Day Act, its implementing regulations and the Federal Acquisition Regulation ("FAR") Subpart 8.7.   In its role, SourceAmerica, among other things, facilitates the distribution of orders from the Federal Government to qualified nonprofit agencies for individuals with significant disabilities.

16.     Lakeview is incorporated in Florida with its headquarters and principal place of business in Pensacola, Florida.  Lakeview's address is 2001 North E Street, Pensacola, Florida, 32501-1922.  Lakeview is a nonprofit entity established in 1954 that is dedicated to reducing employment barriers for individuals with significant disabilities.  Lakeview has a long history of providing vocational services and employment opportunities for such individuals.  In 2015 alone, Lakeview employed over 1,100 people with disabilities, providing them training and supervision and employment in over a dozen states.

17.     Defendant Department of Education is an executive department of the United States Government, and is an "agency" within the meaning of the Administrative Procedure Act. The Department of Education is headquartered in Washington, D.C.

18.     Defendant Department of Defense is an executive department of the United States Government, and is an "agency" within the meaning of the Administrative Procedure Act.  The Department of Defense is headquartered in Washington, D.C.

19.     Defendant Department of the Army is an "agency" within the meaning of the Administrative Procedure Act.  The Department of the Army is headquartered in Washington, D.C.

20.     Defendant Betsy DeVos is Secretary of Education and sued in her official capacity.  Secretary DeVos oversees the Department of Education's activities with respect to the Randolph-Sheppard Act.

21.     Defendant James Mattis is Secretary of Defense and is sued in his official capacity.  Secretary Mattis oversees the Department of Defense activities with respect to the Defense Federal Acquisition Regulation Supplement.

22.    Defendant Ryan D. McCarthy is Acting Secretary of the Army and sued in his official capacity.  Secretary McCarthy overseas the Army's responsibilities with respect to the Randolph-Sheppard Act.

## STATUTORY & REGULATORY BACKGROUND

### I.    AbilityOne Program

#### A.    The Javits-Wagner-O'Day Act

23.    The AbilityOne Program[1] was originally enacted in 1938 by the Javits-Wagner-O'Day Act, 41 U.S.C. § 8501 *et seq.*

24.    Congress created the AbilityOne Program to provide employment opportunities for blind individuals manufacturing commodities for the sale to the Federal Government. Congress later amended the AbilityOne Program to include persons with significant disabilities, and to provide for sale of both commodities and services to the Federal Government.

25.    The JWOD Act's purpose is to "increase employment and training opportunities for persons who are blind or have severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other disabilities."  41 C.F.R. § 51-1.1(a).

26.    Among other things, nonprofit agencies participating in the AbilityOne Program must ensure that individuals with significant disabilities are afforded 75 percent of the contracted work.  41 C.F.R. § 51-1.3.

27.    The U.S. AbilityOne Commission[2] is an independent federal agency that administers the AbilityOne Program and promulgates regulations to implement the AbilityOne Program, codified in 41 C.F.R. § 51-1 *et seq.*

---

[1] The AbilityOne Program was formerly known as the Javits-Wagner-O'Day Program.

28.     The two "central nonprofit agencies"—one of which is SourceAmerica[3]—also play a key role in the AbilityOne Program: to "facilitate the distribution, by direct allocation, subcontract, or any other means, of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled [persons]."  41 U.S.C. § 8503(c).

29.     The central nonprofit agencies are responsible for representing the interests of participating nonprofit agencies—like Lakeview—that employ individuals who are blind or have other significant disabilities.

30.     The AbilityOne Program is responsible for providing jobs to over 45,000 people who are blind or have significant disabilities.  U.S. AbilityOne Commission, 2014 Annual Report at 10.[4]

### B.     The Procurement List

31.     If the AbilityOne Commission determines that a commodity or service is suitable for the Federal Government to procure from qualified nonprofit agencies, the Commission designates it to be placed on the "Procurement List" through a formal notice and comment process.  *See* 41 C.F.R. § 51-2.3.

32.     The Procurement List is a mandatory source priority.  That means that "[t]he JWOD Act *mandates* that commodities or services on the Procurement List required by Government entities be procured . . . from the nonprofit agency employing persons who are blind

---

[2] The U.S. AbilityOne Commission was formerly known as the Committee for Purchase from People who are Blind or Severely Disabled.

[3] SourceAmerica was formerly known as the National Industries for the Severely Handicapped, or NISH.

[4] Available at http://www.abilityone.gov/media_room/documents/Commission_Annual Report_Final_040815_nocropmarks_508v2_FINAL.pdf.

or have other severe disabilities, at a price established by the Committee."  41 C.F.R. § 51-1.2(a) (emphasis added).

33.     When the AbilityOne Commission determines that a commodity or service should be added to the Procurement List, it also designates a particular nonprofit agency as the "Mandatory Source of Supply" and announces that designation in the Federal Register.  Once the Commission adds a commodity or service to the Procurement List, the Federal Government must prioritize purchasing the item from the designated nonprofit agency.

34.     While the Commission is ultimately responsible for designation, the central nonprofit agency plays a significant role in the process—working with the nonprofit agencies that it represents to assess their capabilities and the suitability of a commodity or service for addition to the Procurement List, and making recommendations to the Commission.  All the while, the central nonprofit agency provides continued support, guidance and services to its nonprofit agencies for the duration of their participation under the AbilityOne Program.

35.     The nonprofit agencies also expend considerable time and resources preparing to perform the designated work.

36.     The nonprofit agencies are compensated for their performance via payments from the Federal Government under an awarded contract.  The central nonprofit agency's sole source of compensation is a fee set by the AbilityOne Commission, which the central nonprofit agency can collect from the nonprofit agencies based on the contract payments they receive.

## II.       The Randolph-Sheppard Act

37.       Congress enacted another statute, the Randolph-Sheppard Vending Facility Act of 1936, 20 U.S.C. § 107 *et seq*., to provide employment opportunities to blind persons through the operation of vending facilities in federal buildings.

38.       Congress later expanded the RSA to apply to "vending facilities on any Federal property."   20 U.S.C. § 107(a).   Vending facilities include "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment . . . which may be operated by blind licensees." *Id.* § 107e(7).

39.       The U.S. Department of Education administers the RSA.

40.       Under the Randolph-Sheppard Act, the Secretary of Education designates state agencies—like the Kansas Agency—to issue licenses to blind persons who operate vending facilities.

41.       Blind vendors under the RSA do not contract directly with the Federal Government.   Blind vendors register with the state licensing agency, which responds to solicitations issued by the federal agency for work covered by the RSA.   The state licensing agency then assigns a licensed blind vendor to operate the vending facility if the contract is awarded.   The blind vendor, in turn, enters into an agreement with a commercial company that performs the work required by the Federal Government.

42.       Under the RSA, there is no requirement that the blind vendor hire workers who are blind or have a disability.   *See* Umar Moulta-Ali, Congressional Research Service, *The Randolph-Sheppard Act*, at 7 (Jan. 13, 2011).[5]

---

[5] Available at http://www.acq.osd.mil/dpap/cpic/cp/docs/CRS%20The%20Randolph-Sheppard%20Act%20(Jan%202011).pdf.

43.     The Randolph-Sheppard Act provides that the Department of Education may promulgate regulations specifically as to the "*operation* of cafeterias on Federal property by blind licensees." 20 U.S.C. § 107d-3(e) (emphasis added).

44.     Licensed blind vendors are entitled to a certain priority in contracting with the Federal Government.  In a competitive procurement—i.e., one where the state licensing agency is not negotiating a contract directly with the federal agency—if the state licensing agency submits a bid that is "within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award," the federal agency must give priority to the state licensing agency's licensed blind vendor.  24 C.F.R. § 395.33(b).

45.     Critically, this priority is limited to those contracts for "the *operation* of cafeterias by blind vendors on Federal property."  24 C.F.R.§ 395.33(a) (emphasis added).

46.     Thus, a federal agency seeking to issue a contract for services at, for instance, a military dining facility, must first decide whether the RSA applies to the work.

47.     On this point, the Army has explained:

> If the contracting officer of a particular federal agency determines that the RSA applies to a particular situation, i.e., the solicitation seeks a contractor to operate a military dining facility, then the solicitation will seek proposals from qualified blind vendors under the auspices of the RSA. If the federal contracting officer determines that the RSA does not apply to a particular procurement, then the federal agency will not issue the solicitation under the auspices of the RSA.

Mem. in Supp. of Def.'s Mot. to Dismiss, *State of Kansas v. United States*, No. 15-4907 (D. Kan. Sept. 25, 2015), ECF No. 8, Ex. A, at 13-14.

### III.    Military Dining Facility Contracts

48.    The competing application of the JWOD Act and the RSA to services performed at certain vending facilities—specifically, performance of dining facility attendant services at military dining facilities—used to be a source of confusion.

49.    Congress began to dispel the confusion in the National Defense Authorization Act ("NDAA") for 2006.  Therein, Congress required the agencies administering both the JWOD Act and the RSA—the AbilityOne Commission and the Department of Education, respectively—as well as the Department of Defense to issue a joint statement clarifying "the application of those Acts to both operation and management of all or any part of a military mess hall, military troop dining facility, or any similar dining facility."  National Defense Authorization Act of 2006, Pub. L. No. 109-163, § 848(b), 119 Stat. 3136, 3395 (2006), Ex. B.

50.    The AbilityOne Commission, the Department of Education, and the Department of Defense complied with this Congressional directive.  The three agencies developed a task force comprised of representatives from each agency that "met weekly and engaged in almost daily discussions by electronic mail and telephone to develop a joint statement of policy pursuant to Section 848 [of the 2006 NDAA]."  Joint Report to Congress, Section 848 of the National Defense Authorization Act for Fiscal Year 2006: Application of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act to the Operation and Management of Military Dining Facilities (Aug. 29, 2006) ("Joint Policy Statement"), Ex. C, at 3.[6]  The three agencies also "solicited public comments through a notice in the Federal Register, and approximately 240 comments were received."  *Id.*; *see also* Statement of Policy and Report Relating to Contracting with

---

[6] Available at http://www.acq.osd.mil/dpap/policy/congress/pdf/Section848-20060908.pdf.

Employers of Persons with Disabilities, 71 Fed. Reg. 5819 (Feb. 3, 2006) (requesting public comments), Ex. D.

51.     As required by Congress, the three agencies memorialized their agreement as to the policy that should govern application of the JWOD Act and RSA to military dining facilities in a joint report to Congress dated August 29, 2006 (the "Joint Policy Statement").

52.     According to the Joint Policy Statement, "contracts will be competed under the R-SA when the [Department of Defense] solicits a contractor to exercise management responsibility and day-to-day decision-making for the overall functioning of a military dining facility"—i.e., operation of the military dining facility.  Joint Policy Statement, Ex. C, at 4.

53.     The three agencies agreed: "In all other cases, the contracts will be set aside for JWOD performance . . . when the [Department of Defense] needs dining support services (e.g., food preparation services, food serving, ordering and inventory of food, meal planning, cashiers, mess attendant, or other services that support operation of a dining facility) . . . ."  *Id.* (emphasis added).  Relevantly, mess attendant services are also known as dining facility attendant services. *See* Food Services for Dining Facilities on Military Installations, 81 Fed. Reg. 36,506, 36,508 (June 7, 2016) ("'Mess attendant services' (also known as 'dining facility attendant services') are a subset of 'dining support services.'"), Ex. I.

54.     The three agencies further agreed: "The R-SA shall not apply to any requirement for military dining support services identified on the Procurement List . . . ."  *See* Joint Policy Statement, Ex. C, at 3.

55.     The Joint Policy Statement also explains that the military departments "shall have the discretion to define requirements (e.g., contract statements of work, assignment of tasks and functions among workers in a facility) and make procurement decisions concerning contracting

for military dining support services and the operation of a military dining facility." *Id.* In other words, military departments (like the Army) have discretion to determine whether the procured services are for the operation of a military dining facility (thereby falling under the RSA) or for dining facility attendant services (thereby falling under the JWOD Act).

56.    Congress memorialized certain policies agreed to by the three agencies, and set forth in the Joint Policy Statement, in the 2007 NDAA.   John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 856(a), 120 Stat. 2083, 2347-48 (2006), Ex. F.

57.    Congress further memorialized the agencies' agreement as to the application of the RSA and JWOD Act in the Explanatory Statement accompanying the 2015 NDAA:

> Pursuant to the Joint Policy Statement, the Randolph-Sheppard Act applies to contracts for the operation of a military dining facility, or full food services, and the Javits-Wagner-O'Day Act applies to contracts and subcontracts for dining support services, or dining facility attendant services, for the operation of a military dining facility.

Joint Explanatory Statement to Accompany the National Defense Authorization Act for Fiscal Year 2015, Ex. G; *see also* Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 5, 128 Stat. 3292 (2014), Ex. H.

58.    On June 7, 2016, the Department of Defense issued a proposed rule to be promulgated in the Defense Acquisition Regulation Supplement ("DFARS") that would "implement the provisions of the Joint Policy Report and Policy Statement" agreed to by the AbilityOne Commission and Department of Education.  Food Services for Dining Facilities on Military Installations, 81 Fed. Reg. 36,506 (June 7, 2016), Ex. I.  Notably, the Department of Education was afforded the opportunity to review the proposed rule and in fact provided comments to the Department of Defense.

59.     Notably, Army Regulations provide that "full food service" contracts "cover those activities that comprise the full operation of an Army dining facility" and include "requisitioning, receiving, storing, preparing, and serving food" as well as "related administrative, custodial, and sanitation functions."   Army Regulation 30-22, Army Food Program (Excerpts), Ex. J, at 58 (definition of "Full food service contract").

60.     By contrast, Army Regulations state that "dining facility attendant" or "DFA" services consist of "janitorial and custodial duties within dining facilities" including "sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions."   *Id.* at 57-58 (definition of "Dining facility attendant service contract").

## FACTUAL BACKGROUND

61.     Fort Riley is an active military installation that deployed soldiers in support of combat operations in Iraq and Afghanistan.

62.     To support its logistical functions while soldiers were deployed, the Army utilized contractors to provide both full food services (food preparation and cooking) and dining facility attendant services (sanitation and cleaning).

63.     On June 1, 2006, pursuant to the RSA, the Army awarded the Kansas Agency the Contract No. W911RX-06-D-0003, a full food service contract at Fort Riley.

64.     On September 1, 2011, the Army awarded the Kansas Agency the Contract No. W911RX-11-D-0006, a follow-on full food service contract at Fort Riley, that was scheduled to expire on August 31, 2015.

65.    On August 26, 2015, the Army extended that full food service contract by six months to February 29, 2016 under a "bridge" contract as a consequence of litigation with the Kansas Agency.  *See infra* ¶¶ 74-75.

66.    As the Army redeployed soldiers from Iraq and Afghanistan back to Fort Riley, and prior to the issuance of the "bridge" contract, the Army military command determined—in accordance with Army Regulations and federal procurement regulations—that the Army no longer needed to contract out full food services.  Soldiers could resume operating the military dining facilities.  However, soldiers are precluded from performing dining facility attendant services, and the Army accordingly had to contract out such services.

67.    The Joint Policy Statement, which assigns military departments the discretion to determine whether a contract is for full food services or dining facility attendant services, confirms the fact that the Army's determination here—that the Fort Riley contract is for dining facility attendant services and thereby must be procured under the JWOD Act—was reasonable and must be afforded *Chevron* deference.  *See* Joint Policy Statement, Ex. C, at 3.  Exercising its discretion, the Army initiated the JWOD Act procurement.

68.    On July 17, 2015, following the Army's initiation of that procurement and in accordance with the JWOD Act and its implementing regulations, the AbilityOne Commission proposed the addition of dining facility attendant services at Fort Riley to the Procurement List. The AbilityOne Commission published the proposed addition in the Federal Register for public comment.  *See* Procurement List; Proposed Additions and Deletions, 80 Fed. Reg. 42,481, 42,481-83 (July 15, 2015), Ex. K.

69.    On January 22, 2016, the AbilityOne Commission approved the addition of dining facility attendant services at Fort Riley to the Procurement List, and thereby formally designated

Lakeview as the "Mandatory Source of Supply" effective February 21, 2016.  *See* Procurement

List; Additions and Deletions, 81 Fed. Reg. 3783, 3783-84 (Jan. 22, 2016), Ex. E.

## PROCEDURAL HISTORY

70.   The RSA provides that "whenever any State licensing agency determines that any

department . . . of the United States . . . is failing to comply with the provisions of this chapter or

any regulations issued thereunder," the state agency may "file a complaint with the Secretary [of

Education] who shall convene a panel to arbitrate the dispute."  20 U.S.C. § 107d-1(b).

71.   The RSA further states that "the decision of such panel shall be final and binding

on the parties, except as otherwise provided in this chapter."  *Id.*  While the RSA does provide

that the panel's decision "shall be subject to appeal and review as a final agency action under [the

APA]," *id.* § 107d-2(a), the United States has taken the position that it cannot appeal an RSA

panel decision adverse to the federal entity.  The result is a stacked deck.  If in a dispute the RSA

arbitrators find in favor of the state agency, the United States does not appeal; whereas, when

RSA arbitrators find in favor of the federal entity, the state agency would be able to appeal.

72.   Displeased with the Army's procurement of dining facility attendant services at

Fort Riley from Lakeview and not its preferred vendor, the Kansas Agency filed a letter with the

Department of Education dated May 7, 2015, seeking to initiate an RSA arbitration to challenge

the addition of the services to the AbilityOne Procurement List.  Kansas Agency Request for

Arbitration Letter to Dep't of Educ. Commissioner Janet LaBreck (May 7, 2015), Ex. L.

73.   Therein, the Kansas Agency maintained that the Army's procurement of dining

facility attendant services pursuant to the JWOD Act "ignores the priority of the Randolph-

Sheppard Act" and asked that "an arbitration be convened on whether the Army is conducting the

above-referenced [Fort Riley] solicitation in violation of the Randolph Sheppard Act."  *Id.* at 1.

74.    The Kansas Agency further initiated a suit against the Army in the U.S. District

Court for the District of Kansas, seeking a preliminary injunction to preclude the Army from

conducting the JWOD Act procurement during the pendency of this arbitration proceeding.  *See*

*generally State of Kansas v. United States*, No. 15-4907 (D. Kan. filed July 22, 2015).   The

Army moved to dismiss the Kansas Agency's complaint and opposed its preliminary injunction

request on the grounds that "as a matter of law, the new contract [for dining facility attendant

services at Fort Riley] is governed by JWOD."  Mem. in Supp. of Def.'s Mot. to Dismiss, *State of*

*Kansas v. United States*, No. 15-4907 (D. Kan. Sept. 25, 2015), ECF No. 8, Ex. A, at 3; *see also*

Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), *State of*

*Kansas v. United States*, No. 15-4907 (D. Kan. Oct. 28, 2015), ECF No. 13, Ex. M; Def.'s Resp.

in Opp. to Pl.'s Mot. for Prelim. Inj., *State of Kansas v. United States*, No. 15-4907 (D. Kan. Feb.

17, 2016), ECF No. 20, Ex. N.

75.    On February 26, 2016, the court issued the preliminary injunction, which

precluded the Army from: "conducting any procurement, including making any award of the

contract in connection with cafeteria services at Fort Riley, except as permitted under the RSA

and its regulations, until such time as the arbitration proceeding initiated by the Kansas Agency

under the RSA is concluded, or further order modifying this preliminary injunction."  *State of*

*Kansas v. United States*, No. 15-4907 (D. Kan. Feb. 26, 2016), ECF No. 26 (order granting

preliminary injunction).

76.    SourceAmerica and Lakeview moved to intervene in the district court action,

which the court allowed, and moved to vacate the preliminary injunction, which the court denied.

*State of Kansas v. United States*, No. 15-4907 (D. Kan. Apr. 22, 2016), ECF No. 53 (order

granting motion to intervene); *State of Kansas v. United States*, No. 15-4907 (D. Kan. June 24,

2016), ECF No. 61 (order denying motion to dismiss for lack of jurisdiction and alternatively, to alter, amend or vacate the preliminary injunction).  As the Kansas Agency stated, the only issue before the court and the only relief sought in that action was the preliminary injunction, the lawfulness of which is currently at issue before the U.S. Court of Appeals for the Tenth Circuit. *See* State of Kansas's Mem. Regarding the Status of the Preliminary Injunction Post-Arbitration, *State of Kansas v. United States*, No. 15-4907 (D. Kan. June 20, 2017), ECF No. 83; *Kansas Dep't for Children & Families v. SourceAmerica et al.*, No. 16-3228 (10th Cir. filed July 8, 2016).  Any dispute regarding or arising out of the arbitration decision would be filed in a separate action.

77.     In response to the Kansas Agency's request, the Department of Education convened an arbitration panel on October 15, 2016, stating that: "The central issues to be addressed are whether the Department of the Army has violated the Randolph-Sheppard Act by failing to include the Randolph-Sheppard Act priority in the solicitation of dining facility attendant services at Fort Riley, and whether the proposed inclusion of dining facility attendant services to the United States AbilityOne Commission's Procurement List would violate the no poaching provisions of the John Warner National Defense Authorization Act of 2007."  Dep't of Educ. Commissioner Janet LaBreck Letter Convening Arbitration, Ex. O, at 2.

78.     The arbitration panel (the "Panel") consisted of three members.  The Army appointed General David P. Carey (Ret.), the Kansas Agency appointed Susan Rockwood Gashel as its arbitrator, and Sylvia Marks-Barnett served as the third panel member and Panel Chair.

79.     On two occasions, SourceAmerica and Lakeview sought to intervene in the arbitration to protect their interests in the Army's procurement of dining facility attendant services at Fort Riley.  In their letters to the Department of Education dated April 8, 2016 and

August 31, 2016, SourceAmerica and Lakeview outlined their interests and explained why those interests would be directly impaired in their interests. *See* SourceAmerica and Lakeview Request to Intervene Letter to Dep't of Educ. Commissioner Janet LaBreck (Apr. 8, 2016) ("April 8, 2016 Request to Intervene"), Ex. P; SourceAmerica and Lakeview Request to Intervene Letter to Dep't of Educ. Commissioner Janet LaBreck (Aug. 31, 2016) ("August 31, 2016 Request to Intervene"), Ex. Q.

80.     Neither the Panel nor the Department of Education ever responded to SourceAmerica and Lakeview's requests to intervene.

81.     At the arbitration hearing, the Army maintained its position that "the Randolph-Sheppard Act (RSA), 20 U.S.C. § 107 *et seq.* does not apply to the procurement of dining facility attendant services within military operated cafeterias (i.e., dining facilities); rather, it only applies to the procurement of full food services (FFS) within contractor operated cafeterias." Respondent's Pre-Arbitration Br., *Kansas Dep't for Children and Families v. United States Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA), Ex. R, at 3. The Army cited the Joint Policy Statement, among other things, as evincing this agreed upon policy and underscored its "wide discretion under federal procurement regulations to apply and interpret procurement regulations." *Id.* at 7-13, 16-17.

82.     The Army identified witnesses prior to the arbitration hearing whom the Army intended to call to defend its position that the Army properly procured the dining facility attendant services under the JWOD Act. Among those identified were an official from the U.S. AbilityOne Commission, Mr. Barry Lineback; a representative from SourceAmerica, Mr. Joseph Diaz; and, a representative from Lakeview, Mr. Gary Murphy (the "AbilityOne Witnesses").

Respondent's First Am. Witness List, *Kansas Dep't for Children and Families v. Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA), Ex. S, at 2-3.

83.     The Army intended to call Mr. Lineback to present testimony regarding "the AbilityOne Program which creates employment opportunities for people who are blind or have significant disabilities," that "AbilityOne and one of its non-profit agencies SourceAmerica has an interest in this litigation," and to "help the Panel understand why the AbilityOne Program, SourceAmerica, and Lakeview Center, Inc. were lawfully entitled to receive the dining facility attendant (i.e., mess attendant / sanitation services) contract at Fort Riley." *Id.* at 2.

84.     The Army intended to call Mr. Diaz to present testimony regarding "SourceAmerica's relationship with the AbilityOne Program and its relationship with Lakeview Center, Inc.," "SourceAmerica's role in creating employment opportunities for people who are blind or have significant disabilities," "how dining facility attendant services are different than full food service contracts," "why SourceAmerica is lawfully entitled to receive [the] dining facility attendant service contract in this case," and "the impact and continuing harm SourceAmerica experiences because it is not able to currently perform the dining facility attendant service contract in this case." *Id.*

85.     The Army intended to call Mr. Murphy to present testimony regarding "Lakeview Center's relationship with SourceAmerica[] and the AbilityOne Program," "Lakeview's role as a nonprofit organization that creates employment opportunities for people who are blind or have significant disabilities," "how dining facility attendant services are different than full food service contracts," "why Lakeview Center Inc. is lawfully entitled to receive the dining facility attendant service contract in this case," "Lakeview Center's involvement in this case," and "the impact and continuing harm Lakeview and potential employees in the Fort Riley community are

experiencing due to not currently performing the dining facility attendant service contract."  *Id.* at 3.

86.     The arbitration hearing took place on January 10, 2017.   Arbitration Tr. (Excerpts), Ex. T, at 1.

87.     The AbilityOne Witnesses traveled to and attended the arbitration hearing in order to demonstrate for the Panel that Lakeview was lawfully entitled to receive the dining facility attendant contract at Fort Riley.

88.     Notwithstanding that neither the Kansas Agency nor the Panel had raised any objection as to the admissibility or relevance of the testimony to be provided by the AbilityOne Witnesses, the Panel nonetheless excluded their testimony.

89.     Over objections by the Army as well as SourceAmerica and Lakeview, the Panel Chair found "none of that relevant" and failed to recognize how such testimony "is going to be probative in any way of how the Randolph-Sheppard Act applies to this issue that's before us." Arbitration Tr. (Excerpts), Ex. T, at 90-91.  Indeed, the Panel refused to even hear the objection from counsel for SourceAmerica and Lakeview, stating "No.  You're not a party to this matter." *Id.* at 90.

90.     As a result of the Panel's ruling, even Mr. Murphy, who the Panel determined was "essential to the case of the Dept. of the Army," was precluded from testifying.  S. Marks-Barnett Dec. 22, 2016 Email, Ex. U; Arbitration Tr. (Excerpts), Ex. T, at 92-93.

91.     The Panel's decision to exclude the testimony of AbilityOne Witnesses is inconsistent with a stipulation between the Kansas Agency and the Army that: "If a contract is to be let under the Randolph Sheppard program . . . . many groups might compete for the contract, JWOD would not be one of them . . . .  If the contract is under the JWOD program, then only

JWOD entities are assigned to that contract . . . . Randolph-Sheppard or small business, they are not allowed to get the contract, only a JWOD entity." *Id.* at 104-05.

92.     The Panel Chair repeated this very stipulation in the Arbitration Decision: "If a contract is to be let under the RS program, it is governed by the RS Act. . . . If the contract is under the JWOD program, then only the JWOD entities are assigned to that contract, and other groups including RS Act state licensing agencies (SLAs) are not allowed to receive the contract." Arbitration Decision, *Kansas Dep't of Children and Families v. Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA) ("Arbitration Decision"), Ex. V, at 7.  Despite recognizing the necessary interplay between these two programs, the Panel arbitrarily excluded from the hearing any testimony regarding the JWOD Act as it applies to the dining facility attendant services at Fort Riley.

93.     Not only were the AbilityOne Witnesses precluded from testifying about the JWOD Act, they were also precluded from testifying about the RSA.  For instance, prior to issuing a blanket exclusion of testimony from the AbilityOne Witnesses, the Panel Chair stated with regards to testimony from Mr. Diaz: "I don't need it again about Randolph-Sheppard.  If [Mr. Diaz] wants to talk to me about JWOD, okay . . . . If [Mr. Diaz] could just tell me what AbilityOne is.  I don't need to know about Randolph Sheppard."  Arbitration Tr. (Excerpts), Ex. T, at 270.  The Panel Chair then refused to hear testimony about JWOD Act and its application. *See id.* at 271 ("Why do I care about that?").

94.     Ultimately, the Panel Chair's rulings excluded the AbilityOne Witnesses *in toto*. *Id.* at 90-91.

95.     The resulting prejudice to SourceAmerica and Lakeview was compounded by the fact that the Kansas Agency was permitted to freely elicit testimony from its witnesses—that was

often incorrect—regarding the RSA and the JWOD Act, and their views on the interpretation of those laws, without affording the Army much less the AbilityOne Commission, SourceAmerica or Lakeview the opportunity for rebuttal.  *See, e.g., id.* at 133 (Q.  "What do the Randolph-Sheppard Act regulations provide about the application of the Randolph-Sheppard Act to a contract for the operation of cafeteria services?  [Kansas witness Terry Smith, a "consultant in the Randolph-Sheppard field"]: . . . the Randolph-Sheppard Act applies to any contracts that pertain to the operation of cafeteria services."), *id.* at 136 (Smith testifies that the Fort Riley dining facility attendant services "pertain to the operation of a cafeteria," and thus the Randolph-Sheppard Act applies).

96.     Nonetheless, the uncontradicted testimony of the Army's witness who oversees 174 Army Garrison dining facilities worldwide demonstrated that the RSA covers full food services contracts, and not dining facility attendant services contracts.  He testified that among those facilities, all but one of their contracts for full food services was being performed by an RSA vendor.  By contrast, *for dining facility attendant services*, he testified that there were only two to four contracts being performed by RSA vendors and all of those were subject to litigation. *Id.* at 213-14, 216.

97.     On May 9, 2017, the Panel issued its Findings of Fact and Decision (the "Arbitration Decision") in which two panel members concluded: "With regard to the merits of the Complaint, based on the foregoing, the compelling conclusion is that the Army has violated the RS Act by failing to apply the RS priority in the solicitation DFA [i.e., dining facility attendant] services at Fort Riley."  Arbitration Decision, Ex. V, at 32; *see also* Arbitration Concurrence, *Kansas Dep't for Children and Families v. United States Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA), Ex. BB.

98.    In the Arbitration Decision, the Panel failed to afford the proper deference to the Army's procurement decision—i.e., defining and limiting its needs to dining facility attendant services, and procuring those services in accordance with the JWOD Act.  *Id.* at 21-22, 28.  The Panel also failed to afford the proper deference to the AbilityOne Commission's designation of Lakeview as the "Mandatory Source of Supply" for the dining facility attendant services at Fort Riley on the Procurement List, after notice and comment.  Instead, the Panel relied on lay testimony from the Kansas Agency's witnesses who purported to interpret federal law and its application to the Fort Riley contract.  *See id.* at 8-10.

99.    The Panel further failed to afford the proper deference to the Congressionally mandated Joint Policy Statement, wherein the AbilityOne Commission, the Department of Education and the Department of Defense memorialized their agreed upon policy as to how the JWOD Act and RSA should be applied to contracts at military dining facilities.  *Id.* at 26-27.

100.    General Carey, the third panel member, dissented—rejecting the Kansas Agency's "overly broad interpretation" of the RSA, and determining that the JWOD Act properly applies to dining facility attendant services. Arbitration Dissent, *Kansas Dep't of Children and Families v. Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA) ("Arbitration Dissent"), Ex. W, at 13.

101.    General Carey properly recognized that, pursuant to Army Regulations, there are two types of military dining facility contracts—for full food services and for dining facility attendant services.  *Id.* at 4.  As stated in the Arbitration Dissent: "Even if Kansas continues to ignore the unique realities confronting how the Department of Defense operates military dining facilities, Congress has not.  Through the 2015 NDAA, signed into law on December 9, 2014, Congress expressed its intent that the Randolph-Sheppard Act does not grant bidding priority to

25

blind vendors with regard to solicitations by the military for dining-facility-attendant services." *Id.* at 6.

102.    General Carey further recognized the Army's "wide discretion under federal procurement regulations to apply and interpret procurement regulations," *id.* at 12, and concluded that "Kansas has not shown that the contracting officer's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* at 14.

103.    Notably, in its Post Arbitration Brief, the Army requested a new hearing citing several concerns regarding the fundamental fairness of the arbitration proceeding that precluded the Army from fully presenting and supporting its position as well as "the Panel Chair's judgment, neutrality, and ability to assure a fair hearing."  Respondent's Post Arbitration Br. and Request for a New Hearing, *Kansas Dep't of Children and Families v. Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA), Ex. X, at 3-14.   In his dissent, General Carey concluded "based [on] [his] own observations," that the arbitration "proceedings lacked fundamental fairness" and stated that he "would grant Respondent's plea for a new hearing and would recommend to the Department of Education that an entirely new arbitration panel be appointed."  Arbitration Dissent, Ex. W, at 22.  The panel majority denied the Army's request for a new hearing.  Arbitration Decision, Ex. V, at 32.

104.    Because the Panel is not the entity charged with interpreting and administering the Randolph-Sheppard Act, the Panel's rulings on questions of law are entitled to no deference. Accordingly, the Court reviews such rulings *de novo*.  *See Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012); *Delaware Dep't of Health v. U.S. Dep't of Educ.*, 772 F.2d 1123, 1139 (3d Cir. 1985).

## VIOLATIONS OF LAW

**I.     The Panel Lacked Jurisdiction to Consider the Kansas Agency's Claims.**

105.    The Arbitration Decision should be vacated because the Panel lacked jurisdiction to consider the Kansas Agency's claims.

106.    According to the Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act, the U.S. Court of Federal Claims has exclusive jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (jurisdiction of district courts over such actions was subject to a sunset provision and terminated on January 1, 2001).

107.    At the time the Kansas Agency filed its claims with the Department of Education, the Army had initiated procurement of the dining facility attendant services at Fort Riley under the JWOD Act.

108.    The Kansas Agency's claims before the Arbitration Panel amounted to a bid protest.  The Kansas Agency challenged the Army's procurement of dining facility attendant services at Fort Riley from the Procurement List and requested that the Panel block procurement under the JWOD Act.

109.    The Kansas Agency's claims thus properly fell within the exclusive bid protest jurisdiction of the U.S. Court of Federal Claims.

110.    Because the Panel could not render the Arbitration Decision in the absence of jurisdiction, the Arbitration Decision is contrary to law, in violation of the APA, and therefore must be vacated.  Consequently, any reliance by the Army on that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law.

II.     **The Arbitration Decision Conflicts with the Text and Structure of the Javits-Wagner-O'Day Act.**

111.    The plain text and structure of the Javits-Wagner-O'Day Act and its implementing regulations demonstrate that dining facility attendant services fall under the exclusive purview of the AbilityOne Program.  The Arbitration Panel's decision that the dining facility attendant contract at Fort Riley fell within the RSA's scope is therefore contrary to law and should be vacated.

112.    The JWOD Act provides that the AbilityOne Commission shall designate commodities and services suitable for procurement from qualified nonprofit agencies on the Procurement List, through a formal notice and comment process.  *See* 41 C.F.R. § 51-2.2.

113.    "The JWOD Act *mandates* that commodities or services on the Procurement List required by Government entities be procured . . . from the nonprofit agency employing persons who are blind or have other severe disabilities, at a price established by the Committee."  41 C.F.R. § 51-1.2(a) (emphasis added).

114.    Effective February 21, 2016, and after notice and comment, the AbilityOne Commission added dining facility attendant services at Fort Riley to the Procurement List.  *See* Procurement List; Additions and Deletions, 81 Fed. Reg. 3783, 3783-84 (Jan. 22, 2016), Ex. E. The Commission designated Lakeview as the "Mandatory Source of Supply" therein.  *Id.*

115.    Pursuant to the JWOD Act, the Army was thereby required to procure dining facility attendant services at Fort Riley from the Procurement List and award the contract to Lakeview.

116.    The Army's decision that the dining facility attendant services at Fort Riley fell under the JWOD Act and not the RSA is entitled to *Chevron* deference.  That decision was grounded in the determination of the Department of Defense, AbilityOne Commission, and

Department of Education following notice and comment that mess attendant, i.e., dining facility attendant services, "will be set aside for JWOD performance"—a determination codified and sent to Congress in the Joint Policy Statement. *Chevron* deference is also appropriate because the AbilityOne Commission determined following notice and comment that the dining facility attendant services at Fort Riley should be placed on the Procurement List and making Lakeview the "Mandatory Source of Supply" for the services.

117. Procurement of dining facility attendant services from Lakeview is therefore consistent with Congressional directive as well as agreement by the AbilityOne Commission, Department of Education, and the Department of Defense that the military departments would procure dining facility attendant services pursuant to the JWOD Act and not the RSA.

118. The Panel's opposite conclusion in the Arbitration Decision is arbitrary, capricious, and contrary to law. Consequently, any reliance by the Army on that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law.

## III. The Arbitration Decision Conflicts with the Text and Structure of the Randolph-Sheppard Act.

119. The plain text and structure of the Randolph-Sheppard Act and its regulations demonstrate that the Randolph-Sheppard Act does not apply to dining facility attendant services. The Arbitration Panel's decision that the dining facility attendant contract at Fort Riley fell within the RSA's scope is therefore contrary to law and should be vacated.

120. The RSA provides that the Secretary of Education shall prescribe regulations "to establish a priority for the *operation* of cafeterias on Federal property by blind licensees when he determines . . . that *such operation can be provided* at a reasonable cost *with food of a high quality* comparable to that currently provided to employees." 20 U.S.C. § 107d-3(e) (emphases

added).   Thus, under the RSA, blind licensees' "operation" of cafeterias must include the provision food of a high quality at a reasonable cost.

121.   The RSA's implementing regulations, promulgated by the Department of Education, further demonstrate that the RSA does not cover dining facility attendant services. The regulations provide that, "[i]n order to establish the ability of blind vendors *to operate* a cafeteria *in such manner as to provide food service* at comparable cost and of comparable high quality as that available from other providers of cafeteria services," the appropriate state licensing agency will be invited to respond to solicitations when a cafeteria contract is contemplated.   34 C.F.R. § 395.33(b) (emphasis added).   Further, the RSA priority "in the *operation of cafeterias by blind vendors*" requires a determination "*that such operation can be provided at a reasonable cost*, *with food of a high quality* comparable to that currently provided employees."   *Id.* § 395.33(a) (emphases added).   And again, another regulation states a Federal agency "may afford priority *in the operation of cafeterias by blind vendors*," whenever such agency determines, "on an individual basis, *that such operation can be provided* at a reasonable cost, *with food of a high quality* comparable to that currently provided employees."   34 C.F.R. § 395.33(d) (emphases added).

122.   The terms "operate" and "operation" in the RSA's implementing regulations are construed in context and the structure.   *FCC v. AT&T, Inc.*, 562 U.S. 397, 405 (2011) (construing statutory language "in light of the terms surrounding it"); *United States v. Bronstein*, 849 F.3d 1101, 1109 (D.C. Cir. 2017) (quoting *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1330 (Fed. Cir. 2002)) ("Challenged terms must be read in context of the regulation as a whole").   The regulations confirm that a blind vendor who "operates" a cafeteria must, at a minimum, provide food service in its responsibilities under the contract.   In other words, "operation" of a dining

facility under the Randolph-Sheppard Act is at least synonymous with food services and may include additional services.

123.    Stated otherwise, the RSA's implementing regulations confirm by their plain terms and in context, that blind vendors cannot "operate" a cafeteria—and therefore cannot be afforded RSA priority—unless the vendor "provide[s] food service" under the contract, 34 C.F.R. § 395.33(b), and that "such operation" can "be provided … with food of a high quality," *id.* § 395.33(a), (d).

124.    Under Army Regulations, a contract for dining facility attendant services necessarily does not include a term that the vendor "provide[] food service,"  Army Regulation 30-22, *Army Food Program* (Excerpts), Section II, Glossary, at 57-58 (July, 24, 2012). Therefore, dining facility attendant services by definition do not fall under the purview of the RSA.

125.    Consistent with Army Regulations, the Fort Riley contract for dining facility attendant services did not include any term that the vendor "provide[] food service," and therefore, it does not fall under the purview of the RSA.

126.    The Army's decision that the dining facility attendant services at Fort Riley did not fall under the RSA and instead fell under the JWOD Act is entitled to *Chevron* deference. That decision was grounded in the determination of the Department of Defense, AbilityOne Commission, and Department of Education following notice and comment that the RSA covered services in which the contractor would "exercise management responsibility and day-to-day decision-making for the overall functioning of a military dining facility, " while dining facility attendant services "will be set aside for JWOD performance"—a determination codified and sent to Congress in the Joint Policy Statement.

127.   The Panel's decision that the Army violated the RSA in procuring the services under the AbilityOne Program—a decision which was not the product of notice-and-comment decisionmaking—is not entitled to *Chevron* deference.

128.   The Panel's conclusion in the Arbitration Decision is arbitrary, capricious, and contrary to law.  Consequently, any reliance by the Army on that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law.

**IV.   The Panel's Exclusion of SourceAmerica and Lakeview from the Arbitration Violated Section 555(b) of the Administrative Procedure Act.**

129.   The Panel ignored repeated requests by SourceAmerica and Lakeview to intervene, testify or otherwise participate in the arbitration in violation of Section 555(b) of the Administrative Procedure Act.  The Arbitration Decision therefore should be vacated.

130.   Citing Section 555(b) of the Administrative Procedure Act, SourceAmerica and Lakeview sought to intervene in the arbitration—on April 8, 2016 and again on August 31, 2016—to protect their independent interests in the Army's procurement of dining facility attendant services at Fort Riley.  *See* April 8, 2016 Request to Intervene, Ex. P, at 3; August 31, 2016 Request to Intervene, Ex. Q.  SourceAmerica and Lakeview outlined their respective interests to the Department of Education and explained why those interests would be directly impaired in their absence.

131.   SourceAmerica and Lakeview further noted that the Panel did not have jurisdiction to arbitrate the matter, as the Kansas Agency's claims fell within the exclusive jurisdiction of the U.S. Court of Federal Claims, and submitted their requests to intervene without prejudice to that position. *See* April 8, 2016 Request to Intervene, at 1 n. 1, Ex. P; August 31, 2016 Request to Intervene, Ex. Q.

132.     Neither the Panel nor the Department of Education ever responded to SourceAmerica and Lakeview's requests to intervene.

133.     Subsequently, the Army submitted to the Panel the names of representatives from the AbilityOne Commission, SourceAmerica and Lakeview to testify as witnesses during the arbitration hearing.  Respondent's First Amended Witness List, *Kansas Dep't of Children and Families v. Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA), Ex. S, at 2-3.

134.     Neither the Panel nor the Kansas Agency previously raised any objections as to the admissibility or relevance of the testimony to be provided by the AbilityOne Witnesses. Nonetheless, at the hearing, the Panel excluded the AbilityOne Witnesses, refusing to permit their testimony with respect to the  application of the RSA and JWOD Act to the Army's procurement of dining facility attendant services at Fort Riley.  Arbitration Tr. (Excerpts), Ex. T, at 90-91.

135.     Counsel for SourceAmerica and Lakeview—having never received a response by the Panel to their requests to participate in this proceeding, nor an objection from either the Kansas Agency or the Panel as to the admissibility or relevance of the testimony to be provided by the AbilityOne Witnesses—attempted to object to the Panel's exclusion of the AbilityOne Witnesses.  *Id.* at 90.

136.     The Panel refused to hear the objection, stating: "No.  You're not a party to this matter."  *Id.*

137.     Section 555(b) of the Administrative Procedure Act requires that agencies allow for an "interested person" to participate in adjudicatory proceedings unless participation would disrupt the "orderly conduct of public business."  5 U.S.C.  §  555(b).   The Department of

Education has not issued any guidance or regulations concerning third party participation in RSA arbitration proceedings.

138.     SourceAmerica and Lakeview are "interested persons" under Section 555(b), whose interests are directly implicated by the Randolph-Sheppard Act arbitration.  Lakeview is the "Mandatory Source of Supply" for dining facility attendant services at Fort Riley on the Procurement List and has a statutory right to the dining facility attendant contract.  Lakeview has expended considerable resources to prepare for performance, and suffers ongoing economic losses due to the Army's failure to award it the Fort Riley contract pursuant to the Arbitration Decision.  As the central nonprofit agency, SourceAmerica evaluated Lakeview's capabilities and recommended that the dining facility attendant services be added to the Procurement List with Lakeview as the "Mandatory Source of Supply."   SourceAmerica also provided continued support, guidance and services to Lakeview during this period.  SourceAmerica's sole source of compensation for this work is a fee set by the Commission.  The fee is based upon the Army's payments to Lakeview for performance of dining facility attendant services.     Thus, SourceAmerica too has a statutory right to the Fort Riley contract, and suffers ongoing economic losses due to the Army's failure to award Lakeview the contract pursuant to the Arbitration Decision.

139.     Providing employment opportunities to the significantly disabled is core to the mission of both SourceAmerica and Lakeview.   The contract for dining facility attendant services at Fort Riley is a vehicle for both SourceAmerica and Lakeview to employ and collect payments necessary to serve the significantly disabled.

140.     No other parties to the arbitration proceeding could adequately represent SourceAmerica and Lakeview's interests.

141.     Permitting SourceAmerica and Lakeview to participate would impose no burden on the arbitration hearing.  Indeed, the AbilityOne Witnesses were initially scheduled to testify at the arbitration.

142.     SourceAmerica and Lakeview's participation in the arbitration would also serve the public interest.

143.     Had SourceAmerica and Lakeview been permitted to participate, the Panel would have the benefit of credible testimony and evidence of those entities—namely, the AbilityOne Commission, SourceAmerica and Lakeview—with unique expertise and extensive knowledge regarding the AbilityOne Program and applicability of the JWOD Act to dining facility attendant services.  Instead, the Panel heard testimony of the Kansas Agency's witnesses on these points, and relied upon that unrebutted testimony to issue the Arbitration Decision.

144.     These issues are necessarily and directly related to resolution of the matter before the arbitration panel, namely whether the RSA or the JWOD Act applies to dining facility attendant services at Fort Riley.

145.     The Panel's failure to consider or rule upon SourceAmerica and Lakeview's repeated requests to intervene and the Panel's exclusion of testimony by SourceAmerica and Lakeview representatives at the arbitration hearing are arbitrary, capricious, and violate Section 555(b) of the Administrative Procedure Act.

146.     The Panel's refusal to permit SourceAmerica and Lakeview to participate in the arbitration hearing—on a record devoid of any examination whether SourceAmerica or Lakeview are "interested persons" under Section 555(b) or whether their participation would disrupt the "orderly conduct of public business"—is arbitrary and capricious, and violates Section 555(b) of the Administrative Procedure Act.  Consequently, any reliance by the Army on

that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law.

## V.   The Panel's Exclusion of SourceAmerica and Lakeview from the Arbitration Violated Their Procedural Due Process Rights.

147.   The Panel violated SourceAmerica and Lakeview's constitutional right to due process of law by failing to afford SourceAmerica and Lakeview an opportunity to be heard before depriving them of valuable property interests.

148.   The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Government from depriving any person of life, liberty, or property without due process of law.

149.   SourceAmerica and Lakeview have a direct property interest in the award of the dining facility attendant contract at Fort Riley and payments from the Army under that contract.

150.   Lakeview, as the designated "Mandatory Source of Supply" on the Procurement List, has a direct economic interest and statutory right to a contract award by the Army. Payments to Lakeview under the dining facility attendant contract are necessary to support both SourceAmerica and Lakeview's core mission to serve and employ the significantly disabled.  In its role as central nonprofit agency, SourceAmerica too has a direct economic interest and statutory right to collect fees flowing from the dining facility attendant contract.

151.   By refusing to permit SourceAmerica and Lakeview to intervene, testify, participate or otherwise be heard in the arbitration proceeding, the Panel deprived SourceAmerica and Lakeview of constitutionally guaranteed notice and process before an impartial decisionmaker in violation of SourceAmerica and Lakeview's procedural due process rights under the Fifth Amendment.

152.    By refusing to permit SourceAmerica and Lakeview to intervene, testify, participate or otherwise be heard in the arbitration proceeding, the Panel further violated the rights of Lakeview, the putative awardee, and SourceAmerica to protect their interests in the contract award and payment.  *See* 4 C.F.R. § 21.0(b)(1); *Emerald Coast Finest Produce Co. Inc. v. United States*, 74 Fed. Cl. 679, 680-81 (2006) (citing Fed. R. Civ. P. 24(a)).

153.    The Panel's failure to afford SourceAmerica and Lakeview due process of law violates the Fifth Amendment to the United States Constitution.  The Arbitration Decision should be vacated.  Consequently, any reliance by the Army on that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law.

## VI.    The RSA's Arbitration Provisions Violate the Separation of Powers and Non-Delegation Doctrine.

154.    The RSA's arbitration provisions assign to a panel of private citizens the authority to promulgate rules regarding the application of two federal statutes, an inherently legislative power belonging to Congress, and to interpret how those two federal statutes must be applied, an inherently judicial power belonging to the Judiciary.  By delegating these inherently legislative and judicial powers, the RSA arbitration provisions violate the non-delegation doctrine and thereby violate the United States Constitution.

155.    The non-delegation doctrine establishes clear limits to Congress's ability to outsource regulatory authority or legislative power to private citizens.  *See Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1237 (2015) (Alito, J., concurring) ("Congress cannot delegate regulatory authority to a private entity," and furthermore, "private entities are not vested with legislative powers.") (internal grammatical marks omitted).  "By any measure, handing off regulatory authority to a private entity is 'legislative delegation in its most obnoxious form.'"  *Id.* at 1238 (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).

156.    That is precisely what the RSA arbitration provisions purport to do.  Pursuant to the RSA's arbitration provisions, three private citizens were afforded the authority to regulate the manner in which the RSA and JWOD Act apply to military dining facilities by, for instance, announcing (inaccurately) that "tasks to be performed by a contract for DFA [i.e., dining facility attendant] services include tasks that constitute an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria, or tasks that without which the cafeterias would not be able to function . . . are entitled to RS Act priority when awarding said contract."  Arbitration Decision, Ex. V, at 31.  Not only is this inaccurate, it is inconsistent with the agreement of the two agencies properly charged with administering the JWOD Act and RSA (AbilityOne Commission and Department of Education) and the agency charged with awarding contracts in accordance with both (Department of Defense)—*an agreement that was specifically directed by and later memorialized by Congress*.

157.    The RSA's arbitration provisions further violate the non-delegation doctrine by directing to private citizens the Judiciary's power to resolve disputes regarding the interpretation of the RSA versus other federal statutes, the weight to be afforded the Joint Policy Statement, and the discretion to be afforded to the Army's procurement decisions.  *See* 20 U.S.C. §§ 107d-1(b), 107d-2(a).  Three private citizens purported to interpret the applicable law to conclude, for instance, that "a contracting officer's (KO's) interpretation is not to be afforded deference," Arbitration Decision, Ex. V, at 22, the Army's decision to procure dining facility attendant services is not afforded deference, *id.* at 24, and that the Fort Riley contract "comes within the terms of the RS Act, and its Regulations, and is entitled to afford priority as mandated in the law," *id.* at 26.  These legal interpretations are inaccurate and inconsistent with the plain

language of both the RSA and JWOD Act, federal procurement regulations, relevant case law and the agreed upon Joint Policy Statement, among other things.

158.    The Fort Riley arbitration demonstrated the pitfalls of the RSA arbitration scheme.  The Army itself argued that it was "troubled to learn that [the Kansas Agency's selected arbitrator] has been practicing as an attorney in front of [the Panel chair] from 2012 to 2016, while at the same time serving as an arbitrator with [the Panel chair] in [another RSA arbitration] from 2013 to present, and in this case from 2016 to present."  The Army found it "equally troubling" that the Panel chair had rendered a decision in the Kansas Agency's arbitrator's case while at the same time serving as co-arbitrators in another matter.  Some of this information would have been available to the Army had the Department of Education complied with its obligation to timely publish notice of RSA arbitration decisions in the Federal Register.  34 C.F.R. § 295.13(g).  But the Department of Education had not done so for years.[7]  Accordingly, the Army argued that "[the Department of Education's] failure to follow its own regulation is not only unfair to the general public … but deprived [the Army] of the ability to timely inquire into possible conflicts" by the Panel, and sought a new hearing.  Respondent's Post Arbitration Br. and Request for a New Hearing, *Kansas Dep't of Children and Families v. Dep't of the Army, Fort Riley*, No. R/S 15-15 (Dep't of Educ. RSA), Ex. X, at 10-11.

159.    Moreover, counsel for the Kansas Agency, who represents the interests of state licensing agencies before RSA arbitration panels, also served as arbitrator in a number of other RSA arbitrations including several at the very same time the Fort Riley arbitration was pending. *But see Ass'n of Am. R.R.*, 135 S. Ct. at 1238 ("if the term 'arbitrator' refers to a private arbitrator,

---

[7] Available at https://www.federalregister.gov/documents/search?conditions%5Bagencies%5D=education-department&conditions%5Bterm%5D=%22randolph-sheppard+act%22&conditions%5Btype%5D=NOTICE# (showing a five year hiatus from publishing required notices).

or even the possibility of a private arbitrator, the Constitution is violated.") (Alito, J., concurring).

160.    The RSA's arbitration provisions impermissibly place in the hands of private citizens the ability to determine the metes and bounds of the RSA and the JWOD Act. Consequently, the rights of third parties, such as Lakeview and SourceAmerica, were arbitrarily and summarily dismissed, without interlocutory or intermediary recourse during the arbitration process.

161.    The RSA arbitration provisions are thereby incompatible with the non-delegation principle, because Congress is forbidden from vesting in the hands of private parties regulatory authority or the ability to interpret the law and render unreviewable decisions on the scope of federal statutes.  The Arbitration Decision should therefore be vacated and the RSA's arbitration provisions stricken as unconstitutional.  Consequently, any reliance by the Army on that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law.

## VII.    The Department of Defense Has Unlawfully Withheld or Unreasonably Delayed Promulgation of a Final Rule Memorializing the Joint Policy Statement.

162.    SourceAmerica and Lakeview are adversely affected by the Department of Defense's past and continued failure to promulgate a final DFARS rule governing application of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act in accordance with mandatory deadlines.

163.    Pursuant to Congressional directive in the 2006 NDAA, the AbilityOne Commission, Department of Education and Department of Defense developed a joint policy that governs application of the JWOD Act and RSA to military dining facilities.  The three agencies memorialized their agreement in the Joint Policy Statement dated August 29, 2006.

164.    Congress, in turn, memorialized the Joint Policy Statement in the Explanatory Statement accompanying the 2015 NDAA.

165.    Pursuant to the 2015 NDAA and the attached Explanatory Statement, Congress required that the Department of Defense promulgate regulations within 180 days from the date of the NDAA's enactment on December 19, 2014.

166.    Indeed, the Department of Defense, in describing the status of this very rule, agreed that the Explanatory Statement to the 2015 NDAA "*requires* [that] within '180 days after the enactment of this Act [2015 NDAA], the Secretary of Defense shall prescribe implementing regulations for the application of these two acts [JWOD and RSA] to military dining facilities. Such regulations *shall implement* the Joint Policy Statement . . . .'"  Decl. of M. Bachman in Supp. of Mot. to Dismiss, *State of Kansas v. United States*, No. 15-4907 (D. Kan. Sept. 25, 2015) ECF No. 10-12 ("Decl. of M. Bachman"), Ex. Y, at ¶ 6 (quoting Explanatory Statement) (emphases added).

167.    The Department of Defense further recognized that the Explanatory Statement "*mandates* how the two acts are to be applied within the context of all military dining facilities," by "adopt[ing] the findings of the Joint Status Report" that dining facility attendant services did not fall under the RSA, but instead, fell under the JWOD Act.  *Id.* (emphasis added).

168.    The Department of Defense has not prescribed regulations governing this issue by June 17, 2015, i.e., 180 days from the enactment of the 2015 NDAA on December 19, 2014.  It is now over two years past due.

169.    The Department of Defense has also run afoul of its own DFARS Operating Guide.  *See* Defense Federal Acquisition Regulation Supplement (DFARS) Operating Guide, *State of Kansas v. United States*, No. 15-4907 (D. Kan. Feb. 17, 2016), ECF No. 10-13, Ex. Z.

The DFARS Operating Guide sets forth a Standard Case Timeline that specifies a *one year* timeline from the date upon which the Defense Acquisition Regulation ("DAR") Council opens the case for issuance of a rule to the publication of the final rule.  *Id.* at 1-2; *see also* Decl. of L. Neilson in Supp. of Def.'s Resp. in Opp. to Pl.'s Mot. for Prelim. Inj., *State of Kansas v. United States*, No. 15-4907 (D. Kan. Feb. 17, 2016), ECF No. 20-12, Ex. AA, at 6.

170.   The DAR Council opened the case to draft a rule memorializing the agencies' Joint Policy Statement on February 12, 2015.  Decl. of M. Bachman, Ex. Y, at ¶ 7.  Over two years later, the Department of Defense has yet to publish the final rule.  Thus, the Department of Defense has failed to timely comply even with its own DFARS Operating Guide.

171.   On June 7, 2016, the Department of Defense issued a proposed rule to be promulgated in the DFARS that would "implement the provisions of the Joint Policy Report and Policy Statement" agreed to by the AbilityOne Commission and Department of Education.  Food Services for Dining Facilities on Military Installations, 81 Fed. Reg. 36,506 (June 7, 2016), Ex. I.

172.   The Department of Defense has not yet issued a final rule, nor did it issue an "interim rule" that would be immediately effective, as the Department originally planned.  Decl. of M. Bachman, Ex. Y, at ¶ 10.

173.   As a consequence of the Department of Defense's failure to timely promulgate the regulations, SourceAmerica and Lakeview have been directly injured by the cited confusion on the part of the Department of Education and specifically, the Arbitration Panel, as to whether dining facility attendant services at Fort Riley fall under the exclusive purview of the Javits-Wagner-O'Day Act.  Following the issuance of the Arbitration Decision, the Army has failed to award the Fort Riley contract to Lakeview.  The final DFARS rule would have required the Army to do so notwithstanding the Arbitration Decision.

174.    The Department of Defense's failure to timely promulgate regulations in accordance with a Congressional mandate constitutes "unlawfully withheld or unreasonably delayed" agency action that should be compelled under the Administrative Procedure Act.

## VIII.    SourceAmerica and Lakeview Suffer Concrete, Ongoing Injury and Hardship.

175.    The Arbitration Decision has caused, and continues to cause, SourceAmerica and Lakeview concrete and ongoing irreparable injury.

176.    The Panel's determination that the Army must apply the Randolph-Sheppard Act in procuring dining facility attendant services at Fort Riley has stopped the Army from awarding the Fort Riley contract to Lakeview as required by the JWOD Act.

177.    As a result of the Arbitration Decision, the Army's failure to award the Fort Riley contract to Lakeview, and the Department of Defense's failure to timely promulgate regulations regarding the exclusive application of the JWOD Act to dining facility attendant services, Lakeview is precluded from employing persons with significant disabilities whom were slated to perform the dining facility attendant services at Fort Riley.

178.    As a result of the Arbitration Decision, the Army's failure to award the Fort Riley contract to Lakeview, and the Department of Defense's failure to timely promulgate regulations regarding the exclusive application of the JWOD Act to dining facility attendant services, SourceAmerica and Lakeview have not collected any payments from the Army to which they are entitled and are suffering ongoing economic losses.  Such payments are critical to the operation of both nonprofit entities and the furtherance of their missions.

## CLAIMS FOR RELIEF

### COUNT I
**(Violation of the Administrative Procedure Act and the Tucker Act: the Panel Lacked Jurisdiction to Issue the Arbitration Decision)**

179.   SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

180.   The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act, confers exclusive jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or proposed procurement" in the U.S. Court of Federal Claims.   Because the Kansas Agency challenged a procurement that had been initiated under the JWOD Act, its claims fell within the exclusive jurisdiction of the Court of Federal Claims.

181.   The Panel could not render the Arbitration Decision in the absence of jurisdiction. Accordingly, the Arbitration Decision is contrary to law and must be vacated.

### COUNT II
**(Violation of the Administrative Procedure Act: the Arbitration Decision Is Arbitrary, Capricious, and Not in Accordance with the Javits-Wagner-O'Day Act)**

182.   SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

183.   The Arbitration Decision is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

184.   The Administrative Procedure Act proscribes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

185.   The Javits-Wagner-O'Day Act governs the procurement of dining facility attendant services at Fort Riley, because dining facility attendant services fall under the Javits-

Wagner-O'Day Act, and because the AbilityOne Commission placed those services on the Procurement List.  The Arbitration Decision, which held that the Fort Riley dining facility attendant services fall under the RSA, was therefore contrary to law.

186.    SourceAmerica and Lakeview have exhausted their administrative remedies.  In the alternative, SourceAmerica and Lakeview have no adequate or available administrative remedy, and any effort to obtain any administrative remedy would be futile.

187.    SourceAmerica and Lakeview have no adequate remedy at law.

188.    The Arbitration Decision imposes ongoing and irreparable harm on SourceAmerica and Lakeview.

189.    This Court accordingly should set aside and declare unlawful the Arbitration Decision.  *See* 5 U.S.C. § 706(2).

## COUNT III
### (Violation of the Administrative Procedure Act: the Arbitration Decision Is Arbitrary, Capricious, and Not in Accordance with the Randolph-Sheppard Act)

190.    SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

191.    Arbitration Decision is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

192.    The Administrative Procedure Act proscribes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

193.    The text and structure of the Randolph-Sheppard Act and its implementing regulations demonstrate that the Randolph-Sheppard Act does not cover dining facility attendant services, because such services do not "provide[ ] food service."  The Arbitration Decision's

contrary decision is therefore arbitrary, capricious, and not in accordance with the Randolph-Sheppard Act.

194.    SourceAmerica and Lakeview have exhausted their administrative remedies.  In the alternative, SourceAmerica and Lakeview have no adequate or available administrative remedy, and any effort to obtain any administrative remedy would be futile.

195.    SourceAmerica and Lakeview have no adequate remedy at law.

196.    The Arbitration Decision imposes ongoing and irreparable harm on SourceAmerica and Lakeview.

197.    This Court should set aside and declare unlawful the Arbitration Decision.  *See* 5 U.S.C. § 706(2).

## COUNT IV
### (Violation of Section 555(b) of the Administrative Procedure Act)

198.    SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

199.    Section 555(b) of the Administrative Procedure Act require agencies to allow an "interested person" to participate in adjudicatory proceedings unless participation would disrupt the "orderly conduct of public business."  5 U.S.C. § 555(b).

200.    The Panel's exclusion of SourceAmerica and Lakeview from participating in the arbitration on the sole ground that they were not parties to the arbitration—notwithstanding SourceAmerica and Lakeview's express reliance on Section 555(b), which allows for a non-party's participation, in its requests to intervene—violates Section 555(b) of the APA.

201.    SourceAmerica has exhausted its administrative remedies.  In the alternative, SourceAmerica has no adequate or available administrative remedy, and any effort to obtain any administrative remedy would be futile.

202.    SourceAmerica has no adequate remedy at law.

203.    The Arbitration Decision has imposed ongoing and irreparable harm on SourceAmerica.

204.    The Court should vacate the Arbitration Decision.  *See* 5 U.S.C. § 706(2); 5 U.S.C. § 555(b).

### COUNT V
### (Violation of the Fifth Amendment to the U.S. Constitution: Denial of Procedural Due Process)

205.    SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

206.    The Panel's refusal to permit SourceAmerica and Lakeview to intervene, testify, participate or otherwise be heard in the arbitration proceeding violated SourceAmerica and Lakeview's procedural due process rights under the Fifth Amendment.

207.    The Court should vacate the Arbitration Decision.

### COUNT VI
### (Violation of the U.S. Constitution Article I, § 1, Article II, § 1:  Non-Delegation Doctrine)

208.    SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

209.    The RSA arbitration provisions impermissibly usurp the judicial power, insofar as they purport to render final and binding decisions on the scope of the RSA (and thus, other federal statutes), which is quintessentially Judiciary's role.  In addition, the RSA arbitration provisions violate the non-delegation principle of the U.S. Constitution by purporting to outsource to private parties the ability to render final and binding decisions on the scope of such statutes, notwithstanding the fact that neither legislative, executive, nor regulatory authority can be delegated to private entities.

210.    The Court should declare the RSA arbitration provisions, 20 U.S.C. §§ 107d-1(b), 107d-2(a), unconstitutional.   In addition, the Court should declare unlawful the Arbitration Decision which was the product of that unconstitutional process.

**COUNT VII**
**(Violation of the Administrative Procedure Act and National Defense Authorization Act for Fiscal Year 2015:  Agency Action Unlawfully Withheld or Unreasonably Delayed)**
**(Against Department of Defense)**

211.    SourceAmerica and Lakeview incorporate the preceding paragraphs as if fully set forth herein.

212.    Under the APA, the Court may "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

213.    The Administrative Procedure Act affords the right of judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  *Id*. § 702.  "Agency action" under the Administrative Procedure Act includes a "failure to act."  *Id.* § 551(13).

214.    Congress directed, by the Explanatory Statement to the 2015 NDAA, that the Department of Defense promulgate regulations implementing the Joint Policy Statement within 180 days from the date of the 2015 NDAA's enactment on December 19, 2014—i.e., by June 17, 2015.  Joint Explanatory Statement to Accompany the National Defense Authorization Act for Fiscal Year 2015, Ex. G.

215.    The Department of Defense has not complied with this Congressional mandate.

216.    The Department of Defense's failure to promulgate said regulations within this timeframe constitutes unlawfully withheld and unreasonably delayed agency action.

217.    SourceAmerica and Lakeview are adversely affected by the Department of Defense's past and continued failure to promulgate a final DFARS rule governing the application

48

of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act to military dining facilities, under mandatory deadlines.

218. The Court should compel such agency action under the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in its favor and:

a. Declare that the Arbitration Decision was rendered without jurisdiction;

b. Vacate and set aside the Arbitration Decision for lack of jurisdiction;

c. Declare that the Arbitration Decision is arbitrary, capricious, and not in accordance with law, all in violation of the Administrative Procedure Act, the Javits-Wagner-O'Day Act, the Randolph-Sheppard Act, and the implementing regulations of such Acts;

d. Vacate and set aside the Arbitration Decision under 5 U.S.C. § 706;

e. Declare that the Arbitration Decision is unconstitutional under the Fifth Amendment of the United States Constitution;

f. Vacate and set aside the Arbitration Decision as unconstitutional under the Fifth Amendment of the United States Constitution;

g. Enter a preliminary and a permanent injunction restraining Defendants from implementing or enforcing the Arbitration Decision, or relying on the Arbitration Decision as grounds to deprive Lakeview of its entitlement to the dining facility attendant contract at Fort Riley;

h. Declare that the Department of Defense has failed to promulgate a final DFARS rule governing the application of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act to military dining facilities by statutory deadlines and/or declare that such delay was unreasonable, all in violation of the Administrative Procedure Act;

i.      Order the Department of Defense to promulgate a final DFARS rule governing the application of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act to military dining facilities according to a Court-ordered schedule;

j.      Declare as unconstitutional the Randolph-Sheppard Act's arbitration provisions, 20 U.S.C. §§ 107d-1(b), 107d-2(a);

k.      Order that the Randolph-Sheppard Act's arbitration provisions, 20 U.S.C. §§ 107d-1(b), 107d-2(a), be stricken as unconstitutional;

l.      Award SourceAmerica and Lakeview their costs and reasonable attorneys' fees; and

m.      Order such other relief as this Court may deem just and proper.

Dated:  August 5, 2017                          Respectfully submitted,

/s/ Sonia Tabriz
Sonia Tabriz (VA Bar # 85822)
Craig A. Holman*
Robert A. DeRise*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
Phone: +1 202.942.5000
Fax: +1 202.942.5999
E-mail:  sonia.tabriz@apks.com
E-mail:  craig.holman@apks.com
E-mail:  robert.derise@apks.com

*Counsel for Plaintiffs SourceAmerica and Lakeview Center, Inc.*

*Pro Hac Vice* applications forthcoming