**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

SOURCEAMERICA *et al.*,
    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,
    Defendants.

Case No. 1:17-cv-893

## MEMORANDUM OPINION

Plaintiffs, SourceAmerica and Lakeview, challenge an arbitration proceeding related to the administration of the Randolph-Sheppard Act (RSA)[1], a statute designed to create a preference for vendors employing blind and disabled workers in the award of government contracts. Plaintiffs argue that the arbitration panel erred in applying the RSA rather than the Javits-Wagner-O'Day Act (JWOD),[2] a separate statute that also provides a preference for the award of government contracts to vendors employing the blind and disabled. Plaintiffs allege a number of counts[3] including:

    i. The decision of the arbitration panel was arbitrary and capricious because the decision conflicts with JWOD;

    ii. The panel decision was arbitrary and capricious because the panel erroneously applied the RSA;

    iii. The arbitration panel's decision refusing plaintiffs' request to intervene in the arbitration process was arbitrary and capricious as a violation of the Administrative Procedures Act (APA), 5 U.S.C. § 555(b);

---

[1] 20 U.S.C. § 107 *et seq.*

[2] 41 U.S.C. § 8501 *et seq.*

[3] Plaintiffs chose to withdraw the original count I, charging violations of the APA and Tucker Act on jurisdictional grounds, in view of the Tenth Circuit decision in a case that included plaintiffs. *See Kansas Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017).

  iv. The arbitration panel's decision violated plaintiffs' procedural due process rights by depriving plaintiffs of a protected property interest in a dining services contract with the Army without process;

  v. The structure of the arbitration provisions of the RSA violates Article III by delegating judicial power to an agency and violates the non-delegation doctrine, and

  vi. Defendants violated the APA by withholding an action defendants were legally required to undertake, namely a rulemaking that would have given priority to JWOD over the RSA in determining the distribution of contracts for dining facility services.

Defendants, the Departments of Education and Defense and the heads of those agencies and the Army, move for dismissal under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. Defendants first argue that there are a number of jurisdictional bars to review of the arbitration panel's decision. Defendants also argue that the complaint fails to allege sufficient facts with respect to some of the counts.

The matter has been fully briefed and argued and is now ripe for disposition.

**I.**[4]

SourceAmerica, one of the plaintiffs in this action, is a Washington, D.C. corporation with its headquarters and principal place of business in Vienna, Virginia. SourceAmerica is a nonprofit entity that facilitates the award of contracts by the federal government to qualified nonprofits that employ individuals with significant disabilities.

Lakeview, the other plaintiff in this action, is a Florida corporation with its headquarters and principal place of business in Pensacola, Florida. Lakeview's mission is to reduce barriers to

---

[4] The facts recited here are derived from plaintiffs' complaint and as required by settled Supreme Court precedent are assumed to be true for purposes of defendants' Rule 12(b)(6) motion. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

employment for individuals with disabilities by providing vocational services and employment opportunities to such individuals.

The complaint names the Department of Education and the Department of Defense as defendants. Plaintiffs also sue Betsy DeVos, the Secretary of Education, James Mattis, the Secretary of Defense, and Ryan McCarthy, Acting Secretary of the Army, in their official capacities.

The Army operates Fort Riley, an active military base in the state of Kansas. As part of operating the base, the Army has a number of regulations related to procurement of food and dining services, known collectively as the Army Food Program (AFP). The AFP consists of two functional uses: (i) Full Food Services (FFS), and (ii) Dining Facility Attendant services (DFA). FFS consists of contracts for the operation of dining facilities including requisitioning and serving food, and certain sanitation services. DFA services include contracts for the provision of janitorial services in dining facilities, including trash removal, dishwashing, and other sanitation services.

In 2006, the Army awarded Contract Number W911RX-06-D-0003 for FFS services at Fort Riley to a Kansas state agency, the Kansas Social and Rehabilitative Services Agency (the Kansas Agency). The contract was scheduled to end May 31, 2010, but was extended to November 30, 2010. The Army awarded the contract to the Kansas Agency again in September 2011, and extended the contract to February 29, 2016. As soldiers returned from Afghanistan and Iraq, the number of soldiers at Fort Riley increased and the Army decided soldiers should provide FFS services on base. Accordingly, the Army decided not to renew the FFS contract after February 2016.

Because Army regulations bar soldiers from performing DFA services at Fort Riley, the Army sought bids from civilian contractors in March 2015 to perform DFA services at Fort Riley. In this regard, the Army concluded that the solicitation of bids for DFA services was controlled by JWOD, not the RSA. JWOD requires the government to purchase supplies and services from a list of products and services offered by nonprofit agencies employing blind and disabled workers. A list of participating nonprofits is created by the AbilityOne Commission, a government agency charged with creating job opportunities for people who are blind or who have other significant disabilities. JWOD requires the government to procure services from providers on a list created by AbilityOne, if those services are available from a provider. After the Army began procurement in July 2015, the AbilityOne commission published a proposal by one of the plaintiffs, Lakeview, offering to act as the "Mandatory Source of Supply" pursuant to JWOD.

Before the July 2015 notice was published, the Kansas Agency sent a letter formally requesting arbitration under the RSA. The Kansas Agency argued that the Army's solicitation of bids for DFA services pursuant to JWOD had violated the RSA. In addition to requesting arbitration, the Kansas Agency filed suit against the Army in the U.S. District Court in Kansas seeking to enjoin the Army from awarding a new contract for DFA services without following the RSA's procedure.

On January 22, 2016, AbilityOne notified the Army that Lakeview would supply DFA services at Fort Riley. Shortly thereafter, the U.S. District Court in Kansas enjoined the Army from granting a contract to plaintiffs. *See Kansas Dep't for Children & Families v. United States*, No. 15-4907 (D. Kan. Feb. 26, 2016) (order enjoining DFA contract award). After the contract award was enjoined, plaintiffs intervened in the Kansas litigation. *See Kansas Dep't for*

*Children & Families v. United States*, No. 15-4907 (D. Kan. Apr. 22, 2016) (order granting intervention motion). When the court denied plaintiffs' motion to dismiss, alter, or amend the preliminary injunction, plaintiffs filed an interlocutory appeal in the Tenth Circuit Court of Appeals. *Id.* at 1232. Although the Tenth Circuit's opinion dealt with a number of issues not presented here, the Tenth Circuit did rule that the RSA arbitration panel had jurisdiction to review the parties' claims. *Id.* at 1252. This ruling prompted plaintiffs to withdraw the original count I of their complaint in this case. *See supra* n. 3.

In response to the request by the Kansas Agency, the RSA Commission, the body responsible for administering the RSA, convened an arbitration panel to hear the dispute between the Kansas Agency and the Army. On April 8, 2016, plaintiffs sent a letter to the commission stating a desire to intervene in the arbitration. On August 31, 2016, plaintiffs sent another letter requesting response to their request for intervention. The Commissioner did not respond to either request. When plaintiffs renewed their request to intervene in-person at the arbitration hearing, plaintiffs were again rebuffed on the ground that they were not parties in the matter.

On May 9, 2017, the arbitration panel issued its ruling, concluding that the Army had violated the RSA in its solicitation of DFA services at Fort Riley. The panel also found that the Army had violated the No-Poaching provisions of the National Defense Authorization Act of 2007 by using JWOD to determine from whom bids should be solicited. One member of the panel, General David P. Carey (Ret.) dissented, arguing that that the JWOD Act applies to DFA services and that the Army had properly designated plaintiffs as suppliers of DFA services.

**II.**

Defendants attack jurisdiction using a scattershot approach; in the circumstances, all shots miss the mark and the motion to dismiss on jurisdictional grounds must be denied.

Defendants' first jurisdictional shot argues that plaintiffs' claims are not ripe for adjudication because the Army has not implemented the RSA arbitration panel ruling which deprives plaintiffs of their right to provide services at Fort Riley. This argument fails for the simple reason that plaintiffs have already suffered harm by being deprived of their designation as the mandatory source of supply for DFA services at Fort Riley. The allegations in the complaint suggest that but-for the arbitration panel's decision, plaintiffs would be providing DFA services at Fort Riley. Furthermore, the arbitration panel's decision is final and not likely to change depending on "future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). Thus, plaintiffs' only avenue for relief from the arbitration panel's decision is judicial review, and as such plaintiffs' claims are ripe. Finally, plaintiffs' claims challenging the decision by the arbitration panel present "a purely legal question" and courts have generally held that statutory construction questions presented by a final agency action are ripe for judicial review. *See, e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) (finding a claim challenging final agency action was ripe where "the issue tendered is a purely legal one").[5] Accordingly, defendants' ripeness challenge must be rejected.

Defendants argue in the alternative that plaintiffs lack standing to bring their challenge to the arbitration ruling because plaintiffs are not subject to the arbitration and will only be indirectly affected. This argument also fails, as the complaint makes clear that plaintiffs have adequate standing to bring this action.

---

[5] *See also Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1137-38 (D.C. Cir. 2010) (holding that a challenge to an EPA interpretation of a statute authorizing commencement of enforcement proceedings presented a pure legal question ripe for review); *Pharm. Res. & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 42 n.7 (D.D.C. 2015) (holding a challenge to agency action ripe when it "presents a purely legal question of statutory interpretation").

To show standing, a plaintiff must show injury that is concrete and particularized, fairly traceable to the actions of the defendants, and likely to be redressable by a court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Again, plaintiffs have shown they have standing to challenge the arbitration decision because plaintiffs were deprived of their status as mandatory suppliers for DFA services at Fort Riley by the arbitration panel's ruling, which in turn deprived them of a contract to provide those services.

Nor is defendants' attack on jurisdiction rescued by the argument that plaintiffs do not fall within the zone of interests protected by the RSA's arbitration provisions. The zone of interests test requires that a plaintiff demonstrate that the interest he seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Nat'l Credit Union Admin. v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 492 (1998) (citing *Ass'n of Data Processing Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). Plaintiffs easily satisfy the APA's prudential standing requirement as embodied in the zone of interests test.

Defendants' argument on zone of interest fails because it focuses its analysis on the wrong statutory provision. Defendants argue that the arbitration provisions of the RSA are the relevant statutory provisions for purposes of the zone of interest inquiry. Although defendants are correct that plaintiffs are challenging the actions of the RSA arbitration panel, the alleged violations of law relate not to the RSA's arbitration provisions, but to the JWOD's provisions for mandatory assignment of vendors, the RSA's procurement provisions, and alleged violations of the APA's procedural requirements. Accordingly, the complaint's allegations make clear that the plaintiffs' claims are within the zone of interest of both laws.

For purposes of counts II and III which allege violations of JWOD and the RSA, plaintiffs are clearly within the zone of interests of both laws. JWOD was intended to "increase employment and training opportunities" for blind or disabled persons "through the purchase of commodities or services from qualified nonprofit agencies" such as plaintiffs. 41 C.F.R. § 51-1.1(a).[6] And the RSA "was enacted in 1936 to enlarge economic opportunities of the blind, by giving blind persons priority to operate vending facilities on federal property." *NISH*, 247 F.3d at 197. Because plaintiffs are nonprofits seeking to vindicate the interests of the blind and disabled individuals they serve, plaintiffs fall within the zone of interests protected by JWOD and the RSA, and are well positioned to monitor and address compliance with the act on behalf of its ultimate beneficiaries, the blind and disabled. Accordingly, plaintiffs satisfy the prudential standing requirements of the APA.

Next, defendants argue that the RSA precludes judicial review of arbitration decisions, and thus judicial review under the APA is unavailable because a "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). This argument fails because the RSA does not preclude judicial review.

Courts employ a general presumption in favor of permitting judicial review of administrative action, but the presumption can be defeated where "congressional intent to preclude administrative review is fairly discernible in the statutory scheme." *Block v. Community Nutrition Institute*, 467 U.S. 340, 351 (1984) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 157 (1970)). Generally, a statute implicitly precludes judicial review only where the statutory scheme indicates that Congress sought to limit

---

[6] *See also* 41 U.S.C. § 8503(c); *NISH v. Cohen*, 247 F.3d 197, 201 (4th Cir. 2001) ("The JWOD Act was enacted . . . [with] [t]he primary objective . . . to provide training and employment opportunities for persons who are blind or have severe disabilities.").

8

participation in the administrative process and where third-party lawsuits would be likely to disrupt an otherwise carefully constructed regulatory scheme. *Id.*

This argument fails from the outset because the plain language of the RSA suggests that Congress did not intend to preclude judicial review of RSA arbitration panel decisions. The RSA provides that arbitration panels shall "give notice, conduct a hearing, and render its decision *which shall be subject to appeal and review as a final agency action*." 20 U.S.C. § 107d-2(a) (emphasis added). The language stating that panel decisions are reviewable as final agency actions strongly suggests that Congress contemplated judicial review of RSA arbitration panel decisions, and certainly rebuts the contention that the statutory scheme implicitly bars judicial review. *See Bennett v. Spear*, 520 U.S. 154, 175 (1997) (holding that the Endangered Species Act's language describing agency action as "final' does contemplates judicial review). There is no indication in the statute suggesting that Congress intended to allow only state agencies to seek judicial review of panel decisions, and since Congress addressed the question of review explicitly, the language of the RSA compels the conclusion that judicial review of arbitration panel decisions is not precluded by the RSA.

Finally, defendants argue that plaintiffs have an adequate alternative remedy under the Administrative Dispute Resolution Act, 28 U.S.C. § 1491(b). This argument is merely a variant of the defendant's previous argument suggesting that the RSA precludes judicial review. Although the APA limits review in cases where another statute provides an adequate remedy, *see* 5 U.S.C. § 704,[7] there is still a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).

---

[7] *See also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016); *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996).

As explained *supra*, the RSA explicitly contemplates judicial review of arbitration panel decisions, and as such, there is a high bar to overcome the strong presumption in favor of judicial review. The remedy defendants suggest, a bid protest in the Court of Federal Claims, is not an adequate alternative remedy within the meaning of the APA. As the Supreme Court explained in *Bowen*, "the remedy available . . . in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." 487 U.S. at 905. Because the Claims Court offers at best "doubtful and limited relief[,]" the possibility that plaintiffs may eventually be able to launch a bid protest action in the Court of Federal Claims does not, without more, preclude judicial review under the APA. *Id.* at 901. Furthermore, a number of courts, including the Court of Federal Claims, have held that review of RSA arbitration panel decisions is available under the APA, and that there is no reason to require plaintiffs to wait to bring a bid protest action in the Court of federal claims. *See Colorado Dept. of Human Services v. United States*, 74 Fed. Cl. 339, 347 (Fed. Cl. 2006).[8] In sum, the Administrative Dispute Resolution Act does not provide an adequate alternative remedy sufficient to displace judicial review under the APA.

### III.

Defendants' Rule 12(b)(6) argument – that the complaint fails to allege facts sufficient to state a claim upon which relief can be granted – is governed by a legal standard too well-settled to be disputed or to require extended discussion. A district court should dismiss a complaint if, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable factual inferences in plaintiff's favor, the complaint does not allege "enough facts to state a claim to

---

[8] *See also Kansas v. SourceAmerica*, 2017 WL 4900801, at *15 (10th Cir. Oct. 31, 2017) (holding that judicial review of RSA arbitration panel decisions is appropriate because "the Court of Federal Claims lacks Tucker Act jurisdiction" to hear a bid protest).

relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The factual allegations cannot merely amount to speculations, and must show more than "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). According to defendants, the complaint does not allege sufficient facts with respect to counts IV, V, VI, and VII to state a plausible claim for relief. Here, too, defendants adopt a scattershot approach, but in this instance some of the shots hit the mark.

**A.**

Count IV of the complaint alleges that the RSA arbitration panel violated § 555(b) of the APA by denying plaintiffs' petition to intervene in the panel hearing. Section 555(b) provides in pertinent part "[s]o far as the orderly conduct of public business permits, an interested person may appear before an agency . . . for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function." 5 U.S.C. § 555(b). Few published cases have interpreted this portion of § 555(b), and it is apparently rarely invoked. Those decisions that have dealt with claims under § 555(b) have generally held that the provision provides interested parties with a limited right of intervention. *See, e.g.*, *Block v. S.E.C.*, 50 F.3d 1078, 1085 (D.C. Cir. 1995) ("[Section] 555(b) is universally understood to establish the right of an interested person to participate in an on-going agency proceeding."); *see also Animal Legal Def. Fund, Inc. v. Vilsack*, 237 F. Supp. 3d 15, 21-25 (D.D.C. 2017) (finding the provision obligated agencies to consider requests for intervention and state their grounds for denying intervention). That limited right of intervention is subject to agencies' "broad discretion to limit the participation of interested individuals and organizations in agency proceedings." *Animal Legal Def. Fund, Inc.*, 237 F. Supp. 3d at 22. Although that discretion is broad, agencies must at least state a reason,

11

supported by the administrative record, for denying intervention. *Id.* at 23. Here, the reasons stated, as alleged in the complaint, do not pass muster.

Defendants argue that count IV should be dismissed because the complaint fails to allege an attempt to intervene. That argument fails; the complaint alleges that plaintiffs sought to intervene in the arbitration by sending two letters to the panel seeking intervention, and that plaintiffs again attempted to intervene at the arbitration hearing itself. *See* Compl. ¶¶ 129-32; Comp. Exs. P, Q. Defendants' argument that the letters were not sufficient to invoke a right of intervention because they were addressed to officials at the Department of Education rather than the arbitration panel does survive scrutiny because the officials to whom plaintiffs sent the letters were the Arbitration Clerks at the Department of Education Office of Special Education and Rehabilitative Services, the office responsible for RSA arbitration.

Thus, the letters were in effect adequate motions requesting intervention. Even if the letters themselves did not constitute a valid attempt to intervene, which they did, plaintiffs also allege that they attempted to intervene orally at the arbitration hearing. That allegation, even absent the existence of the two previous letters seeking intervention, would be sufficient on its own to satisfy the attempt to intervene requirement under § 555(b). Thus, plaintiffs have alleged sufficient facts to give rise to a claim under § 555(b).

Defendants next argue that the failure of the arbitration panel to allow plaintiffs to intervene was "harmless" and therefore not actionable under the APA. This argument also fails; the allegations in the complaint make clear that the failure to allow intervention was hardly harmless.

The complaint adequately alleges that the failure to allow plaintiffs to intervene in the arbitration panel hearing resulted in prejudice to plaintiffs. In this respect, the complaint alleges

supported by the administrative record, for denying intervention. *Id.* at 23. Here, the reasons stated, as alleged in the complaint, do not pass muster.

Defendants argue that count IV should be dismissed because the complaint fails to allege an attempt to intervene. That argument fails; the complaint alleges that plaintiffs sought to intervene in the arbitration by sending two letters to the panel seeking intervention, and that plaintiffs again attempted to intervene at the arbitration hearing itself. *See* Compl. ¶¶ 129-32; Comp. Exs. P, Q. Defendants' argument that the letters were not sufficient to invoke a right of intervention because they were addressed to officials at the Department of Education rather than the arbitration panel does survive scrutiny because the officials to whom plaintiffs sent the letters were the Arbitration Clerks at the Department of Education Office of Special Education and Rehabilitative Services, the office responsible for RSA arbitration.

Thus, the letters were in effect adequate motions requesting intervention. Even if the letters themselves did not constitute a valid attempt to intervene, which they did, plaintiffs also allege that they attempted to intervene orally at the arbitration hearing. That allegation, even absent the existence of the two previous letters seeking intervention, would be sufficient on its own to satisfy the attempt to intervene requirement under § 555(b). Thus, plaintiffs have alleged sufficient facts to give rise to a claim under § 555(b).

Defendants next argue that the failure of the arbitration panel to allow plaintiffs to intervene was "harmless" and therefore not actionable under the APA. This argument also fails; the allegations in the complaint make clear that the failure to allow intervention was hardly harmless.

The complaint adequately alleges that the failure to allow plaintiffs to intervene in the arbitration panel hearing resulted in prejudice to plaintiffs. In this respect, the complaint alleges

that a key witness – a representative of the AbilityOne program – was barred from testifying at the hearing, and that plaintiffs were denied the opportunity to argue in favor of the admissibility of the witnesses' testimony because plaintiffs' were not parties to the arbitration hearing. Compl. ¶¶ 134-136. The complaint further alleges that this witnesses' testimony would have helped to clarify the requirements of the JWOD and RSA, which would have changed the arbitration panel's ruling. *Id.* This contention is further bolstered by the government's brief in support of the government's motion seeking rehearing by the arbitration panel. *See* Compl. Ex. X. In its brief, the government argues that the AbilityOne representative's testimony was not only "relevant," but also that the government "suffered prejudice when it was not allowed to offer [his] testimony at the hearing." *Id.* at 3-4. This admission by the government in its previous challenge to the arbitration panel's decision, combined with the complaint's other allegations, are sufficient at this stage to demonstrate the existence of prejudicial error stemming from the denial of plaintiffs' intervention request. Accordingly, defendants' motion to dismiss count IV on this ground must be denied.

**B.**

Count V of the complaint asserts a procedural due process claim pursuant to the Fifth Amendment of the U.S. Constitution. To state a procedural due process claim, plaintiff must allege (i) that he possessed a protected liberty or property interest, (ii) that the government or its agents deprived him of this interest, and (iii) that this deprivation occurred without constitutionally sufficient process. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). The Supreme Court has explained that "to have a property interest in a benefit" a plaintiff must show "a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In cases involving government contracts, the Fourth Circuit and other

courts have explained that a plaintiff's hope or expectation of receiving a future contract, without more, does not create a constitutionally protected property interest. *See Bannum, Inc. v. Town of Ashland*, 922 F.2d 197, 200 (4th Cir. 1990).[9]

Defendants' reliance on these settled legal principles, is understandable but misplaced in this case. This is so because plaintiffs do allege the impairment of a constitutionally protected property interest that is not foreclosed by the legal principles stated above. Specifically, according to the complaint, plaintiffs were designated as the "Mandatory Source of Supply" for dining facility services at Fort Riley. Compl. ¶¶ 149-150. According to plaintiffs, this designation under JWOD as the mandatory source of supply entitled plaintiffs to an award of the DFA contract, and therefore plaintiffs had a constitutionally protected property interest in the DFA contract. Defendants argue that designation as a mandatory supplier does not guarantee that plaintiffs will receive the DFA contract because (i) the Army might decide it no longer needs DFA services, (ii) the AbilityOne Commission might decide to designate a different supplier before the contract is awarded or might designate multiple suppliers, or (iii) the AbilityOne Commission might grant a purchase exception allowing purchase of DFA services from someone other than plaintiffs, *see* 41 C.F.R. § 51-4(a)-(c). Although defendants are correct that these intervening events could prevent the ultimate award of the DFA services contract, there is no indication that any of these events is likely to occur, and at this stage, taking the allegations in the complaint as true, plaintiffs have demonstrated that absent the arbitration panel's ruling plaintiffs would have been statutorily entitled to provide DFA services at Fort Riley.

---

[9] *See also Redondo-Borges v. U.S. Dep't of Housing & Urban Development*, 421 F.3d 1, 9 (1st Cir. 2005) ("plaintiffs' dashed hopes of receiving future government work, without more, cannot yield a constitutionally protected property interest."); *Walentas v. Lipper*, 862 F.2d 414, 419 (2d Cir. 1988) (finding no property interest in a frustrated expectation of future employment); *HLI Lordship Indus., Inc. v. Comm. for Purchase from the Blind & Other Severely Handicapped*, 615 F. Supp. 970, 976 (E.D. Va. 1985) (rejecting a procedural due process claim seeking to challenge the placement of items on the JWOD Procurement List, finding that there is no property right to government contracts), *rev'd on other grounds*, 791 F.2d 1136 (4th Cir. 1986)

Accordingly, at this stage the complaint alleges the existence of a protected property interest in the DFA services contract, and defendants' motion to dismiss must be denied.

**C.**

Next, plaintiffs invoke the constitutionally based nondelegation doctrine to argue that (i) that the RSA arbitration provisions violate Article III's vesting clause by vesting judicial power in an executive agency, and (ii) that the RSA improperly vests legislative power in an executive agency in violation of the nondelegation doctrine. Finally, one of defendants' arguments hits its mark; both of plaintiffs' delegation arguments fail and accordingly must be dismissed.

Article III, § 1 of the Constitution provides that "[t]he judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish." The vesting clause "safeguards the role of the Judicial Branch . . . by barring congressional attempts to transfer jurisdiction for the purpose of emasculating constitutional courts[.]" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986) (citations omitted). When deciding whether a delegation of jurisdiction to a non-Article III tribunal violates the vesting clause of Article III, the touchstone established by the Supreme Court is whether the delegation "threatens the independent role of the Judiciary in our constitutional scheme." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 590 (1985). The Supreme Court has identified three factors courts should consider in determining whether a delegation presents a threat to Article III courts: (i) whether the non-Article III tribunal "exercises the range of jurisdiction and powers normally vested only in Article III courts," (ii) "the origins and importance" of the rights adjudicated by the non-Article III tribunal, and (iii) "the concerns that drove Congress to depart from the requirements of Article III." *Schor*, 478

U.S. at 851. A careful review of these factors demonstrates that the RSA arbitration scheme does not violate Article III.

With respect to the first *Schor* factor, the Supreme Court has found especially important (i) whether the non-Article III tribunal is entrusted only with a "particularized area of law[,]" (ii) the range of remedies the tribunal is empowered to issue, and (iii) whether the non-Article III tribunal's decision is reviewable by Article III courts. *Id.* at 852. The RSA's arbitration scheme only allows the arbitrators to evaluate claims related to the alleged failure of a federal entity to comply with the RSA and its implementing regulations. *See* 20 U.S.C. § 107d-1(b).[10] Furthermore, the RSA arbitration panel is also empowered to issue only a narrow range of remedies, indicating that the RSA arbitration scheme represents little threat to Article III courts. The panel's remedial powers are extremely limited; although the panel has the power to make a determination as to whether a federal entity violates the RSA or its regulations, the panel does not have the power to order a specific remedy. 20 U.S.C. § 107d-2(b)(2).[11] Finally, the reviewability of the RSA panel's decisions weighs in favor of a finding that the agency's power does not offend Article III's vesting clause. *Schor*, 458 U.S. at 853.[12] Thus, the first *Schor* factor indicates that the delegation of adjudicative power to the RSA panel does not present a threat to the power of Article III courts.

---

[10] *See also Md. State Dep't of Educ. v. U.S. Dep't of Veterans Affairs*, 98 F.3d 165, 169 (4th Cir. 1996) (holding that § 107d-2(b)(2) "limits the authority of an arbitration panel convened under § 107d–1(b) to a determination of whether the acts of the federal entity 'are in violation' of the substantive provisions of the [RSA]").

[11] *See also Md. State Dep't of Educ.*, 98 F.3d at 169 (finding that the RSA "places the responsibility for ending the violation on the head of the federal entity and does not authorize a § 107d-1(b) arbitration panel to order the federal entity to take specific remedial action").

[12] *Thomas*, 473 U.S. at 592 (holding that the availability of even limited judicial review "preserves the 'appropriate exercise of the judicial function'") (quoting *Crowell v. Benson*, 285 U.S. 22, 54 (1932)).

The second *Schor* factor requires courts to look at the "origins and importance" of the rights adjudicated by the non-Article III panel. *Schor*, 478 U.S. at 853-54. In general, adjudication of constitutional rights raises Article III concerns, whereas adjudication of statutory rights represents a less dangerous encroachment on the judicial power. *Thomas*, 473 U.S. at 592. The RSA itself provides the only rights adjudicated by the arbitration panels, and thus the RSA arbitration scheme does not adjudicate any rights of constitutional importance that might present a threat to the judiciary.

The third and final *Schor* factor looks to "the concerns that drove Congress to depart from the requirements of Article III." *Schor*, 478 U.S. at 851. The terms of the RSA suggest that Congress sought to create a non-Article III forum to arbitrate disputes arising from the RSA with the intention that the arbitration panel would have the first, not the last word on the applicability of the RSA and the command of its provisions. As discussed above, the RSA itself provides for judicial review, and there is no suggestion that Congress created the RSA arbitration with an eye toward divesting Article III courts of jurisdiction. Thus, the third factor suggests that the RSA arbitration scheme does not violate Article III.

In sum, every *Schor* factor points persuasively to the same conclusion, namely that the RSA arbitration provisions do not represent an impermissible intrusion on the judicial function vested in courts by Article III.

Plaintiffs also allege that the RSA arbitration provisions violate the nondelegation doctrine. The nondelegation doctrine bars Congress from delegating "its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem wise and beneficent." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935). Plaintiffs' claim fails from the outset, however, because the complaint does not allege

that Congress delegated any legislative authority to the RSA arbitration panel. Instead, the complaint alleges that Congress delegated "to private parties the ability to render final and binding decisions on the scope of . . . the RSA." Compl. at ¶ 209. This kind of authority – the authority to "construe the law" – is undoubtedly judicial or adjudicative and not legislative. *See Wayman v. Southard*, 23 U.S. 1, 46 (1825). Thus, Congress's decision to delegate adjudicatory powers to RSA arbitration panels simply does not implicate the nondelegation doctrine.

In sum, both of plaintiffs' delegation theories fails and Count VI must be dismissed.

**D.**

Count VII alleges that the Department of Defense violated the National Defense Authorization Act for Fiscal Year 2015 by unlawfully withholding the promulgation of rules governing conflicts between the JWOD and RSA. Under the APA, federal courts have the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As the Supreme Court has made clear, an action is unlawfully withheld only if the "action is legally *required*" and an action is legally required only if there is a mandatory, statutory obligation that an agency take a specific discrete action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). Thus, even where a plaintiff requests a discrete action "[t]he limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65.

Plaintiffs claim that the Department of Defense's failure to promulgate regulations implementing the Joint Policy Statement within 180 days from the date of the 2015 NDAA enactment," Compl. ¶ 214, constitutes a form of agency action "unlawfully withheld or unreasonably delayed" within the meaning of § 706(1) of the APA. Defendants argue that the

Joint Policy Statement lacks the force of law and therefore cannot provide a basis for a claim that the Department of Defense was "legally required" to promulgate the regulations plaintiffs seek.

Though few cases directly address whether a Joint Policy Statement accompanying a bill can legally bind an agency to act, the few cases that have discussed the issue indicate that such statements lack the force of law, and therefore cannot provide a basis for relief under § 706(1) of the APA. As the Supreme Court has explained, congressional statements that are not themselves voted on and approved by Congress lack the force of law. *Am. Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 616 (1991) (noting that the House and Senate Committee Reports on National Labor Relations Act Amendments of 1974 do not have "the force of law, for the Constitution is quite explicit about the procedure that Congress must follow in legislating."). The Joint Explanatory Statement to the 2015 NDAA is similar because Congress did not vote on the statement and the statement did not go through the process of bicameralism and presentment necessary to give it the force of law. [13] Other courts have held that similar Joint Explanatory Statements do not have the force of law. *See, e.g.*, *Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 236-37 (D.C. Cir. 2003) (holding that a joint explanatory statement "do[es] not have the force of law" because "[w]hile the conference report and the joint explanatory statement are printed in the same document, Congress votes only on the conference report.").[14] Because the Joint Policy Statement in the 2015 NDAA lacks the force of law, the Department of Defense is not "legally required" to

---

[13] Plaintiffs argue that the Joint Policy Statement, by its own terms, states that it "shall have the same effect with respect to implementation of this legislation [2015 NDAA] as if it were a joint explanatory statement of a committee of conference." Compl. Ex. G at 1. The intent of the authors of the Joint Policy Statement to have the Joint Statement treated as though it has the force of law does not mean that the Joint Policy Statement has the force of law. As explained *supra*, statements of Congress have the force of law only if they go through the constitutionally proscribed process of bicameralism and presentment. *See Am. Hosp. Ass'n*, 499 U.S. at 616.

[14] *See also Goldring v. Dist. Of Columbia*, 416 F.3d 70, 75 n.3 (D.C. Cir. 2005) (same).

promulgate regulations related to the RSA and JWOD procurement processes, and therefore plaintiffs' claim seeking to compel agency action fails.[15]

## IV.

In sum, defendants' Rule 12 motion seeking dismissal of plaintiffs' complaint largely fails. Defendants' jurisdictional arguments all fail, and defendants' Rule 12(b)(6) argument succeeds only with respect to counts VI and VII. Thus, for the foregoing reasons, defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., is denied in part and granted in part. The motion is granted with respect to plaintiffs' nondelegation argument in count VI and plaintiffs' APA claim in count VII, and those counts are dismissed. The motion is denied in all other respects.

The Clerk is directed to provide a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
March 23, 2018

T. S. Ellis, III
United States District Judge

---

[15] Rather than address the question of whether the Joint Policy Statement operates with the force of law, plaintiffs argue that the Department of Defense has repeatedly stated that it believes it was mandated to promulgate regulations under the Joint Policy Statement. See Compl. Ex. Y ¶ 6; Compl. Ex. M at 15, 16. Plaintiffs have pointed to no authority suggesting that agencies are lawfully compelled to act simply because the agency itself believes it is bound to promulgate regulations. Although it may be unfair to plaintiffs for the Department of Defense to represent that it believes it must act and then to refuse to do so, that alone does not mean that the Joint Policy Statement mandates Department of Defense action, and it certainly does not give the Joint Policy Statement the force of law. The Department of Defense does not have the authority to create a statutory obligation where Congress has not done so.