**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **SOURCEAMERICA, *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-cv-893** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **EDUCATION, *et al.*,** | ) | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs SourceAmerica and Lakeview Center, Inc., nonprofits that seek to enhance economic opportunities for the blind, request judicial review of the decision of an arbitration panel, convened by the Secretary of Education, that concluded the Department of the Army ("Army") violated the Randolph-Sheppard Act when the Army sought to award to plaintiffs a contract for services in Army dining facilities rather than to intervenor, the Kansas Department for Children and Families, a state agency that also seeks to enhance economic opportunities for the blind. This is a somewhat curious situation—it is, in essence, a dispute between organizations, both of which seek to advance the economic interests of the blind, as to which is entitled to a preference in the Army's contracting decision. And this curious situation is further compounded by the involved factual, legal, and procedural history of this case.

At issues now are the parties' cross-motions for summary judgment. The motions have been fully briefed and argued and are now ripe for disposition.

.

Just as this case involves multiple organizations that seek to enhance economic opportunities available to the blind, it also involves multiple statutes that provide a preference for the blind in federal contracting decisions. In particular, the Randolph-Sheppard Act ("RSA"), 20 U.S.C. §§ 107–107f, and the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 8501–8506, both create a preference for the blind in federal contracting decisions, although they differ in important respects. A basic understanding of both statutes is necessary to understand the factual and procedural history of this case and the current dispute.

Congress enacted the RSA to "provid[e] blind persons with remunerative employment, enlarge[e] the economic opportunities of the blind, and stimulat[e] the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a). To effectuate these aims, the RSA provides a "priority . . . to blind persons licensed by a State agency" in "the operation of vending facilities on Federal property." § 107(b). The RSA tasks the Secretary of Education ("the Secretary") with implementing this preference for blind vendors and promulgating regulations in accordance with the statute. §§ 107(b), § 107a(a). Specifically, the RSA directs the Secretary to designate a state licensing agency in each state. §§ 107a(a)(5), 107b. The designated state licensing agencies seek permits or contracts from federal departments, agencies, and instrumentalities for the operation of vending facilities, and state licensing agencies that are awarded such permits or contracts then must issue licenses to blind vendors to operate the vending facilities. § 107a(a)(5), (b).

The RSA also tasks the Secretary with reviewing federal departments', agencies', and instrumentalities' decisions to limit the placement or operation of vending facilities. § 107(b).

Specifically, the RSA requires that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified." *Id.* This provision is referred to *infra* as the "RSA Review Requirement."

Anticipating that conflicts might arise between state licensing agencies and the federal departments, agencies, and instrumentalities from which state licensing agencies seek permits and contracts, Congress provided for a process for the arbitration of such disputes. Specifically, the RSA provides that state licensing agencies may compel the Secretary to convene an arbitration panel when they conclude that a federal department, agency, or instrumentality is violating the RSA or its regulations.[1] § 107d-1(b). The arbitration panel is to consist of three members: (1) a member designated by the state licensing agency; (ii) a member designated by the federal department, agency, or instrumentality involved; and (iii) a member jointly selected by these members. § 107d-2(b)(2). Importantly, the arbitration panel is authorized to determine only whether the federal department, agency, or instrumentality violated the RSA or its regulations. *Id.*; *Md. Dep't of Educ. v. Dep't of Veterans Affairs,* 98 F.3d 165, 169 (4th Cir. 1996). If such a violation is found, the head of the federal department, agency, or instrumentality is responsible for remedying the violation. § 107d-2(b)(2); *Md. Dep't of Educ.,* 98 F.3d at 169. The RSA provides that arbitration decisions constitute final agency action for purposes of the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* § 107d-2(a).

---

[1] The RSA also authorizes blind vendors to initiate arbitration proceedings to resolve disputes with state licensing agencies, but that process is not relevant to this case. *See* 20 U.S.C. §§ 107d-1(a), 107d-2(b)(1).

Similar to the RSA, the JWOD aims to "increase employment and training opportunities for persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1(a). And, similar to the RSA, the JWOD effectuates this aim by creating a preference that benefits blind persons in federal contracting. Unlike the RSA, however, the JWOD is not limited in scope to permits or contracts for the operation of vending facilities on federal property; rather, the JWOD's preference applies to nonprofit agencies that employ workers who are blind or have significant disabilities and that are included on the Act's procurement list. 41 U.S.C. § 8504(a). The United States AbilityOne Commission ("the Commission"), the federal agency charged with administering the JWOD, designates central nonprofit agencies to help select products and services offered by nonprofits employing the blind and severely disabled suitable for inclusion on the procurement list. § 8503(c). When the Committee places products and services on the procurement list, it designates a nonprofit agency as the mandatory source of supply for those products or services. 41 C.F.R. § 51-5.2(a). Federal entities seeking to procure products or services included on the procurement list must procure those products and services from the nonprofits selected by the Committee and included on that list. 41 U.S.C. § 8504(a).

A final statute, the John Warner National Defense Authorization Act for Fiscal Year 2007 ("JWNDA"), Pub. L. No. 109-364, merits brief mention before the factual and procedural history of this dispute is recounted. The JWNDA, as relevant here, provides that the RSA and the JWOD are inapplicable in certain circumstances. This provision is referred to *infra* is the "JWNDA No-Poaching Provision." Specifically, the provision provides that the RSA "does not apply to full food services, mess attendant services, or services supporting the operation of a military dining facility that, as of the date of the enactment of this Act, were services on the procurement list established under" the JWOD. *Id.* at § 856(a)(1). The JWNDA No-Poaching Provision further provides that

4

the JWOD "does not apply at the prime contract level to any contract entered into by the Department of Defense as of the date of the enactment of this Act with a State licensing agency under the [RSA] for the operation of a military dining facility." *Id.* at § 856(a)(2).

## B.

The parties to this action are involved with these statutory schemes to varying degrees. Plaintiff SourceAmerica is a creature of one of these schemes. Specifically, SourceAmerica is a JWOD central nonprofit agency. SourceAmerica works closely with plaintiff Lakeview Center, Inc. ("Lakeview"), a nonprofit agency that was designated by the Commission as the mandatory source of supply of certain services on the JWOD's procurement list. Intervenor, the Kansas Department for Children and Families ("Kansas"), is intimately familiar with the other primary statutory scheme in this case, the RSA, because of its status as an RSA state licensing agency. Defendant the Department of Education ("DOE"), through its Secretary, Betsy Devos, is charged with administering the RSA. The DOE, through its Secretary, convened the arbitration at issue here between the Army and Kansas.

## C.

With the statutory schemes outlined and the principal players identified, it is appropriate next to outline the pertinent factual and procedural history of this case.[2] The dispute revolves around the procurement of a contract for services to be performed in the dining facilities at Fort Riley, an active military installation operated by the Army in Kansas. Pursuant to Army regulations, the Army contracts for two different types of services in its dining facilities, Full Food Services ("FFS") and Dining Facility Attendant ("DFA") services. The Army defines FFS as "a

---

[2] The facts recited herein are derived from the parties' respective briefs in support of their motions for summary judgment and their oppositions and responses thereto, as well as from the administrative record.

contract that covers those activities that comprise the full operation of an Army dining facility. It includes, but is not limited to, requisitioning, receiving, storing, preparing, and serving food . . . [and] the performance of related administrative, custodial, and sanitation functions." Resp't's Pre-Arbitration Br. 4 (citing U.S. Dep't of Army, Reg. 30-22, Army Food Program, glossary (July 24, 2012)), at Admin. R. 61. DFA services, according to Army regulations, are "[t]hose activities required to perform janitorial and custodial duties within dining facilities. [They] include[] . . . sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions." *Id.*

In 2006, the Army awarded Kansas a FFS contract pursuant to the RSA. As required by the RSA, Kansas awarded the contract to a blind vendor. In 2011, the Army awarded Kansas a follow-on contract for the provision of FFS that was scheduled to expire in August 2015.[3]

The Army subsequently determined that it no longer needed a FFS contract because Army soldiers formerly deployed in Iraq and Afghanistan could perform most of the duties, including cooking, at the Fort Riley dining facilities. However, because Army regulations prohibited soldiers from performing DFA services, the Army was required to contract out these services. Thus, the Army decided that it would procure a new contract, effective upon the conclusion of Kansas's contract, that covered only DFA services. Specifically, this new DFA contract would be for "janitorial and custodial duties within dining facilities [and] [i]nclude[] . . . cleaning, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning and other sanitation related functions." Draft of Solicitation, Offer, and Award

---

[3] According to an Army contracting specialist who testified during the arbitration, Army personnel eventually began performing many of the duties required to operate the dining facilities at Fort Riley and the blind vendor Kansas selected began performing only DFA services. Arbitration Tr. 26:16–28:12, at Admin. R. 103–05. This occurrence is immaterial to the current dispute. The RSA's applicability to the Army's proposed contract, and not the legality of altering the terms of the previous contract awarded pursuant to the RSA, is at issue.

for DFA Services 7 (July 20, 2015), at Admin. R. 1002. Believing that a contract covering only DFA services did not constitute the operation of vending facilities, the Army concluded that the new contract would not be subject to the RSA's preference for blind vendors in the operation of vending facilities. Accordingly, the Army instead sought to procure a contract pursuant to the JWOD. To that end, the Commission proposed adding the Fort Riley DFA services to the JWOD's procurement list through publication in the Federal Register in July 2015. The Commission ultimately added the DFA services to the procurement list and formally designated Lakeview as the mandatory source of supply, effective February 2016. SourceAmerica facilitated the process.

In March 2015, the Army informed Kansas that, following the conclusion of Kansas's contract, the Army would purchase only DFA services through a new contract not subject to the RSA. Dissatisfied with this turn of events and convinced that the new DFA contract was subject to the RSA, Kansas, in May 2015, filed a request with the Secretary for arbitration with the Army. As required by the RSA, the Secretary, in October 2016, convened a three-member panel to arbitrate the dispute.[4] *See* 20 U.S.C. § 107d-1(b). Kansas also filed suit in the United States District Court for the District of Kansas and obtained a preliminary injunction preventing the Army from proceeding with the JWOD procurement during the pendency of arbitration. *Kansas v. United States*, 2016 WL 3129397, at *3 (D. Kas. Feb. 26, 2016).[5] SourceAmerica and Lakeview—plaintiffs here—successfully intervened in the litigation. *See Kansas v. United States,* 192 F. Supp. 3d 1184, 1187 (D. Kas. 2016). The Army complied with the injunction and awarded a bridge contract to Kansas.

---

[4] The panel consisted of Sylvia Marks-Barnett, the chair; Susan Rockwood Gashel; and General David P. Carey.

[5] The Tenth Circuit affirmed the district court's finding of jurisdiction but declined to address whether the injunction was properly granted because the injunction had since been dissolved as a consequence of the issuance of the arbitration panel's decision. *Kansas Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226, 1252 (10th Cir. 2017).

Plaintiffs also sought to intervene in the arbitration between Kansas and the Army based on plaintiffs' interest in the DFA contract at issue in the arbitration. To this end, plaintiffs sent two letters to the DOE requesting to intervene in the arbitration, dated April 8, 2016 and August 31, 2016. Plaintiffs did not receive a response to either letter.

In advance of the arbitration, the Army submitted an amended witness list that represented that it intended to call witnesses employed by plaintiffs and the Commission to support its position that the RSA does not apply to contracts for DFA services at military dining facilities. Specifically, the Army represented that it intended to call: (i) Barry Lineback, Director of Business Operations at the Commission; (ii) Joe Diaz, Vice President of Operations at SourceAmerica; and (iii) Gary Murphy, Representative at Lakeview.

The arbitration hearing was held on January 10, 2017. Plaintiffs attended the hearing and sought to be heard through counsel, but the panel denied this request. The panel also refused to hear testimony proffered by the Army from three witnesses employed by plaintiffs and the Commission—the three witnesses the Army had previously informed the panel that it intended to call.

Following the hearing, the Army filed a request for a new hearing, citing fundamental unfairness in the proceeding and concerns about the panel's lack of impartiality. First, the Army argued that the panel chair improperly excluded relevant testimony from the three witnesses employed by plaintiffs and the Commission. Specifically, the Army argued that the exclusion of the witnesses was improper because

> (i) the panel chair had previously found one of the witnesses essential for the Army's defense and ordered the DOE to fund his travel to the hearing;
> (ii) the panel did not raise any relevancy concerns when the Army provided the panel with a summary of the witnesses' testimony twenty days before the hearing;

8

(iii) the panel chair asked an Army contract specialist about the Commission and JWOD preference but refused to hear evidence about the same from the Commission's and plaintiffs' employees, who had direct knowledge of these matters;[6] and

(iv) the panel chair knew or should have known that SourceAmerica and Lakeview had successfully intervened in the related federal litigation.

Second, the Army argued that the panel chair acted inappropriately in riding to the airport with Kansas's counsel after requesting permission from the Army's counsel "to ride to the airport with your enemy" in the presence of the public and witnesses. Dep't of the Army's Post-Arbitration Br. & Request for New Hearing 9 (Feb. 17, 2017), at Admin. R. 1590. Third, the Army argued that "the Panel Chair and [Kansas's] Counsel made it known . . . that they both had flights" at the beginning of the hearing and repeatedly referenced these flights, thereby inappropriately "set[ting] the tone . . . that their schedules were more important than obtaining evidence." *Id.* Finally, the Army questioned the panel's lack of impartiality because one of the panel members had represented a client and obtained a favorable outcome in an arbitration proceeding presided over by the panel chair at the same time that the two sat on an arbitration panel together in a separate proceeding.

The arbitration panel issued its decision on May 9, 2017. The two-member majority denied the Army's request for a new hearing and held (i) that the Fort Riley DFA contract was subject to the RSA's preference; (ii) that the Army violated the RSA when it failed to apply the RSA's preference to the Fort Riley DFA contract; (iii) that the Army violated the RSA Review Requirement when, without consulting the Secretary, it included services formerly performed by an RSA vendor in a new contract that would not be performed by an RSA vendor; and (iv) that the

---

[6] The Army also argued that the panel chair "expressed confusion regarding the role of SourceAmerica and the" JWOD and that her questions to the Army contracting specialist "demonstrate[d] that . . . [she] did not appreciate the core elements of the [Army's] position." Dep't of the Army's Post-Arbitration Br. & Request for New Hearing 7 (Feb. 17, 2017), at Admin. R. 1588.

Army violated the JWNDA No-Poaching Provision when it worked with the Commission to place services formerly performed by an RSA vendor on the JWOD's procurement list.

General Carey, the panel's third member, dissented. He concluded that the RSA's preference did not apply to the Fort Riley DFA contract and that he would have granted the Army's request for a new hearing owing to concerns about the fairness of the proceeding. Following the panel's decision, the preliminary injunction issued by the district court in Kansas was dissolved, and the lawsuit was voluntarily dismissed by the parties in February 2018. *Kansas Dep't for Children & Families v. United States,* 2018 WL 1087848, at *1 (D. Kan. Feb. 21, 2018).

Following the issuance of the arbitration panel's decision, SourceAmerica and Lakeview initiated this action against defendants the DOE and its Secretary, Betsy DeVos; the Army and its Acting Secretary, Ryan D. McCarthy; and the Department of Defense ("DOD") and its Acting Secretary, Patrick M. Shanahan[7] challenging the arbitration panel's decision. Kansas subsequently intervened in the action. Plaintiffs, defendants, and intervenor have all moved for summary judgment on various grounds.

Plaintiffs argue that the arbitration decision is contrary to the RSA and the JWOD, in violation of the APA; that the arbitration panel engaged in improper *ex parte* communications in violation of the APA; that the arbitration panel violated 5 U.S.C. § 555(b) of the APA by refusing to allow plaintiffs to participate in the proceeding; and that the arbitration panel violated plaintiffs' Fifth Amendment right to procedural due process. Plaintiffs request vacation of the arbitration decision, a declaration that the Fort Riley DFA services are covered by the JWOD and not the

---

[7] Plaintiffs named then-Secretary of Defense James Mattis, in his official capacity, as a defendant. Acting Secretary Shanahan has since replaced Secretary Mattis and is now the proper defendant. *See* Rule 25(d), Fed. R. Civ. P.

RSA, and an injunction preventing defendants from implementing or enforcing the arbitration decision.

Defendants respond that only a state licensing agency may seek judicial review of an arbitration panel decision, and thus argue that plaintiffs cannot seek judicial review here. With respect to the merits, however, defendants agree with plaintiffs that the Army did not violate the RSA and thus contend that the arbitration decision was incorrect in this respect. But defendants argue that plaintiffs' remaining challenges to the arbitration decision should be rejected. Specifically, defendants argue that the panel's alleged *ex parte* communications should not be addressed because they are outside the scope of the complaint; that although the panel erred when it refused to allow plaintiffs to participate in the arbitration pursuant to 5 U.S.C. § 555(b), the error was harmless; and that plaintiffs' Fifth Amendment rights were not violated. Finally, defendants argue that the equitable relief plaintiffs request is inappropriate and that the proper remedy is remand to the arbitration panel.

Finally, intervenor argues that the arbitration decision was correct and is not contrary to either the RSA or the JWOD. Intervenor also argues that the panel did not violate 5 U.S.C. § 555(b) because plaintiffs lacked standing to intervene in the arbitration proceeding. Finally, intervenor argues that plaintiffs' Fifth Amendment rights were not violated.

## II.

Summary judgment is appropriate under Rule 56, Fed. R. Civ. P., where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is especially appropriate in APA actions, as they do not ordinarily

involve fact-finding because "the focal point for judicial review [under the APA] should be the administrative record already in existence." *Camp v. Pitts,* 411 U.S. 138, 142 (1973) (*per curiam*). It is clear the material facts supporting summary judgment are undisputed and require that the parties' cross-motions for summary judgment be granted in part and denied in part.

### III.

The RSA makes clear that an RSA arbitration decision is "subject to appeal and review as final agency action." 20 U.S.C. § 107d-2(a). And the RSA also acknowledges that the APA provides the standards for this review. In this respect, the APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "in excess of statutory justification, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

Judicial review of an RSA arbitration panel's decision is conducted *de novo. Sauer v. Dep't of Educ.,* 668 F.3d 644, 650 (9th Cir. 2012). The arbitration decision must be set aside if it is "not in accordance with law." 5 U.S.C. § 706(2)(A); *Sauer,* 668 F.3d at 650. Importantly, the arbitration panel's interpretation of the RSA is not entitled to *Chevron* deference. *Sauer,* 668 F.3d at 650. *Chevron* deference applies "only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon,* 546 U.S. 243, 255–56 (2006) (quoting *United States v. Mead Corp.,* 533 U.S. 218, 226–27 (2001). As the Ninth Circuit has explained, *Chevron* "deference [to an RSA arbitration panel's interpretation] is inapplicable . . . because the Act does not delegate interpretive authority to the arbitration panel;

instead, it gives the Secretary of Education the responsibility of administering the Act and issuing interpretive regulations. *See* 20 U.S.C. § 107(b)."[8] *Sauer,* 668 F.3d at 650.

## IV.

## A.

Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has interpreted this provision as authorizing those who are injured by agency action to seek judicial review of that action where "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 153 (1997). Defendants argue that plaintiffs cannot satisfy this zone of interests test and thus lack prudential standing to challenge the arbitration decision. Defendants' argument fails because plaintiffs' interests are at least "arguably within the zone of interests . . . protected or regulated by the statute." *Id.*

Defendants contend that the arbitration provisions of the RSA are the proper focus of the zone of interests analysis in this case. This contention is incorrect; the Supreme Court has explained that "[w]hether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone of interests test is to be determined . . . by reference to the particular provision of law upon which plaintiff relies." *Bennett v. Spear,* 520 U.S. 154, 175–76 (1997). As such, "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis

---

[8] As the Ninth Circuit has noted, "[a]lthough an arbitration panel's decision is considered final action of the Secretary for purposes of appeal, *see* § 107d-2(a), this is a legal fiction: an arbitration panel is composed of members appointed by the parties to the arbitration, not of Department of Education officials whose expertise merits . . . deference." *Sauer,* 668 F.3d at 650–51.

for his complaint." *Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 883 (1990). Here, plaintiffs rely upon the RSA's procurement provisions, which create a preference for blind vendors in "the operation of vending facilities." 20 U.S.C. § 107(b). Plaintiffs complain that defendants' violation of these provisions—namely, the erroneous panel finding that the RSA's procurement provisions apply to the Fort Riley DFA services—has injured plaintiffs' economic interests and interest in providing opportunity and autonomy to the blind and severely disabled. Therefore, it is these procurement provisions that must be the focus of the zone of interests analysis.

Importantly, the Supreme Court has explained that the zone of interests "test is not meant to be especially demanding; . . . there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 400 (1987) (footnote and citation omitted). Furthermore, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012). That is not the case here; indeed, plaintiffs' interests are clearly within the zone of interests protected or regulated by the statute.

In enacting the RSA's procurement provisions, Congress explained that it intended to "provid[e] blind persons with remunerative employment, enlarge[e] the economic opportunities of the blind, and stimulat[e] the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a).[9] Plaintiffs' "core mission" is to "provid[e] employment opportunities to individuals with significant disabilities," specifically including the blind. Compl.

---

[9] Defendants narrowly characterize the interests protected by the RSA as "those . . . of state licensing agencies and vendors, not the interests of entities such as SourceAmerica and Lakeview." Defs.' Mem. Opp'n Pls.' Mot. Summ. J. & Supp. Cross-Mot. Summ. J. 17. The RSA's plain language precludes this characterization.

¶ 3. Plaintiffs thus have strong interests in "providing blind persons with remunerative employment [and] enlarging the economic opportunities of the blind," two of Congress's purposes in enacting the RSA's procurement provisions. Plaintiffs allege that defendants' actions injured these interests and plaintiffs in this appeal seek to protect these interests. Accordingly, the interests plaintiffs seek to protect through judicial review are clearly "within the zone of interests to be protected or regulated by the statute . . . in question." *Ass'n of Data Processing Serv. Org., Inc.,* 397 U.S. at 153. Accordingly, defendants' zone of interest challenge fails.

## B.

Defendants next argue that judicial review is unavailable because the RSA precludes judicial review here. To be sure, the APA provides that judicial review is unavailable where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). To determine "[w]hether and to what extent a particular statute precludes judicial review[,]" courts look to the statute's "express language . . . [and] the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 345 (1984). Defendants have failed to establish that these sources indicate that the RSA precludes judicial review here.

Defendants argue that the RSA permits only state licensing agencies to seek judicial review of arbitration decisions and thus precludes judicial review by plaintiffs. Specifically, defendants contend that because the RSA provides for only state licensing agencies to seek arbitration with federal departments, only state licensing agencies may seek judicial review of those arbitrations. *See* 20 U.S.C. § 107d-1(b). Defendants rely on *Block v. Community Nutrition Institute,* 467 U.S. 340 (1984), to support their argument. *Block,* however, is distinguishable and thus fails to establish that the RSA precludes judicial review by plaintiffs.

In *Block*, the Supreme Court considered whether consumers could seek judicial review of "milk market orders setting the minimum prices that handlers (those who process dairy products) must pay to producers (dairy farmers) for their milk products." *Block*, 467 U.S. at 341–42. Under the operative statute, handlers could seek administrative review of market orders and, after obtaining such review, handlers could then seek judicial review. *Id.* at 346. The Supreme Court concluded that consumers could not seek judicial review of market orders because "[t]he restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* at 347.

Defendants argue that plaintiffs here, like the consumers in *Block*, cannot obtain judicial review. This argument has some force but is ultimately unpersuasive. *Block* is distinguishable because that case involved a complex regulatory scheme that included handlers and producers but excluded consumers.[10] *Id.* at 342, 346–47. Indeed, the Supreme Court explicitly relied on this complex regulatory scheme in finding that the statute precluded judicial review by consumers. *Id.* at 346–47. Although the arbitration at issue here involves state licensing agencies but not central nonprofit agencies or other nonprofits, it is not a "complex scheme of th[e] type [at issue in *Block* where] the omission of . . . a provision [for participation by plaintiffs] is sufficient reason to believe that Congress intended to foreclose [plaintiffs'] participation in the regulatory process." *Id.* at 347. There, the complex scheme involved "a cooperative venture among the Secretary [of Agriculture], handlers, and producers" in which "[h]andlers and producers . . . [we]re entitled to participate in the adoption and retention of market orders." *Id.* at 346–47. Specifically, the scheme in *Block* "provide[d] for agreements among the Secretary, producers, and handlers, for hearings

---

[10] Although the regulatory scheme provided "an opportunity for public hearing and comment" prior to the issuance of a milk market order, the Supreme Court did not view this as participation in the "development of market orders." *Block*, 467 U.S. at 342, 346. Indeed, the Supreme Court specified that "[h]andlers and producers—but not consumers—are entitled to participate in the adoption and retention of market orders." *Id.* at 346.

among them, and for votes by producers and handlers." *Id.* (citations omitted). The Supreme Court worried that "[a]llowing consumers to sue the Secretary would severely disrupt this complex and delicate administrative scheme." *Id.* at 348. Here, by contrast, the RSA merely provides a preference for state licensing agencies in certain federal contracts and provides for state licensing agencies to seek arbitration of alleged violations of the RSA. As such, unlike the process for setting market orders in *Block,* the RSA's contracting and arbitration processes are not "a complex, technical undertaking." *Id.* at 347. Thus, unlike the statute in *Block*, the RSA does not create a complex regulatory scheme, the balance of which may be upset by the participation of parties other than state licensing agencies. Thus, the RSA does not create an inference that Congress intended to foreclose the availability of judicial review for all parties except state licensing agencies.

*Block* is also distinguishable because the interests of those precluded from seeking judicial review in *Block*—namely, consumers—were adequately represented by those authorized to seek judicial review, namely handlers. Specifically, consumers and handlers shared an interest in the promulgation of market orders that set lower minimum purchase prices. Although not relied on by the Supreme Court, these corresponding interests are nonetheless significant because they shed light on the ultimate inquiry, namely whether "the congressional intent to preclude judicial review is fairly discernible in the statutory scheme." *Id.* at 351 (internal quotations and citation omitted). Congressional intent to preclude judicial review is less likely to be found—and thus greater evidence of it is needed—where preclusion would prevent parties likely to be impacted by agency action from having their interests represented during judicial review. Here, the interests of nonprofits like plaintiffs will not infrequently be at odds with the interests of state licensing agencies. As demonstrated by this case, the award of a contract pursuant to the RSA may eliminate opportunities otherwise available to nonprofits like plaintiffs and their members. Limiting the

availability of judicial review to state licensing agencies does not adequately protect the interests of nonprofits like plaintiffs. Accordingly, defendants' reliance on *Block* is unpersuasive. Moreover, the Supreme Court has directed that even "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Id.* at 351. The presumption is overcome only where "the congressional intent to preclude judicial review is 'fairly discernible' in the detail of the legislative scheme." *Id.* Such an intent is not fairly discernible here.

## C.

Finally, defendants argue that Lakeview may not seek judicial review of the arbitration decision because the APA provides judicial review only where "there is no other adequate remedy in a court," 5 U.S.C. § 704, and an adequate alternative remedy exists in the form of a bid protest action under the Administrative Dispute Resolution Act, 28 U.S.C. § 1491(b).[11] This argument fails because a bid protest action is not an adequate remedy in this case.

A bid protest action is available to "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b).

Defendants contend that a bid protest action constitutes an adequate remedy for Lakeview in this case and thus precludes Lakeview from seeking judicial review of the arbitration decision pursuant to the APA. Although defendants argue that a bid protest is an adequate remedy, they admit that "this suit, as framed in plaintiffs' present complaint, most likely would *not* fall within the bid protest jurisdiction of the Court of Federal Claims." Defs.' Reply 5 (emphasis in original).

---

[11] Defendants do not allege that § 704 bars claims by SourceAmerica.

Indeed, defendants argue only that "*[i]f* the Army were to move forward with a procurement harming Lakeview's interests, Lakeview would have an adequate remedy in the form of a bid protest action." Defs.' Mem. 19 (emphasis added). This falls far short of an adequate remedy, as Lakeview has allegedly already suffered harm that may not be the subject of a bid protest action. The Army planned to award Lakeview a DFA contract, and the Commission placed Lakeview on the procurement list, designating Lakeview as the mandatory source of supply of the Fort Riley DFA services. Following the arbitration decision, the Army changed course to comply with the arbitration decision, and Lakeview was not awarded the anticipated contract. Defendants do not argue that Lakeview currently has a remedy. And, significantly, defendants do not even argue that Lakeview *will* have a remedy in the future; they argue only that Lakeview *may* have a remedy in the future. The potential availability of a bid protest action at some future date is insufficient to protect Lakeview's interests. Lakeview has allegedly already suffered harm—namely, the denial of a contract that it was otherwise entitled to receive—and there is no guarantee that it will be able to seek redress for that harm through a bid protest action. As such, a bid protest action is not an adequate remedy that precludes judicial review pursuant to the APA.[12] Accordingly, plaintiffs have standing to seek judicial review of the RSA arbitration decision.

---

[12] Defendants' reliance on *Jersey Heights Neighborhood Association v. Glendening,* 174 F.3d 180 (4th Cir. 1999), is unpersuasive. There, the Fourth Circuit concluded that plaintiffs "lack[ed] an APA action to enforce Title VI's supervisory duties against the federal agencies" because the "direct remedy [available] against funding recipients" was "adequate" and "preferable to a direct suit against the agency" pursuant to the APA. *Jersey Heights Neighborhood Ass'n,* 174 F.3d at 191–92. Defendants argue the case establishes that a remedy may be adequate even if it will not become available until the occurrence of future events. However, the Fourth Circuit in *Jersey Heights Neighborhood Association* concluded that judicial review under the APA was foreclosed by the availability of an adequate remedy in a single paragraph that did not consider the possibility that such future events may not occur and thus the alternate remedy may never become available. *See id.* Indeed, the Fourth Circuit concluded the remedy was adequate in one sentence that merely explained that the Supreme Court viewed the remedy as "preferable to a direct suit against the agency." *Id.* As such, defendants' reliance on *Jersey Heights Neighborhood Association* is misplaced.

## V.

### A.

With respect to the merits, plaintiffs and defendants argue that the arbitration panel erroneously concluded that the Fort Riley DFA contract is subject to the RSA's preference. Intervenor responds that the arbitration panel correctly reached this conclusion. The APA requires that agency findings be set aside if they are "not in accordance with law." 5 U.S.C. § 706(2)(A); *Sauer*, 668 F.3d at 650. Plaintiffs and defendants are correct that the panel erred in concluding that the RSA's preference applies to the Fort Riley DFA contract. Accordingly, the finding must be set aside.

The RSA's preference applies to "the operation of vending facilities on Federal property." 20 U.S.C. § 107(b).[13] As such, the RSA's preference only applies to the Fort Riley DFA contract if the contract is for the operation of vending facilities. It is not a contract for the operation of vending facilities; it is a contract for less than that. In particular, the Fort Riley DFA contract is for "janitorial and custodial duties within dining facilities [and] [i]nclude[s] . . . cleaning, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning and other sanitation related functions." Draft of Solicitation, Offer, and Award for DFA Services 7 (July 20, 2015), at Admin. R. 1002. These services constitute ancillary services in support of the operation of a vending facility and do not constitute the operation of a vending facility. The plain language of the RSA's preference, the meaning of "operate" in other parts of the RSA, and the regulations issued pursuant to the RSA make this clear.

---

[13] *See also* 20 U.S.C. § 107(a) (explaining the RSA's purposes in establishing that "blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property"); 20 U.S.C. § 107a(b) (imposing a duty on state licensing agencies to give a priority to blind vendors "in issuing each such license for the operation of a vending facilitate"); 34 C.F.R. 395.33 (specifying when a preference applies "in the operation of cafeterias by blind vendors").

The plain language of the RSA makes clear that its preference applies only where the vendor exercises control or management over the functioning of the vending facility as a whole and thus does not apply to the Fort Riley DFA contract. In particular, the RSA's preference applies only to "the *operation* of vending facilities on Federal property." 20 U.S.C. § 107(b) (emphasis added). "Operation" requires control or management of the vending facilities. One cannot be said to operate something unless one is in some sense in charge; operation requires more than mere performance of assigned tasks. And, crucially, the RSA's preference applies to "the operation *of vending facilities*,"[14] indicating that it applies only where the vendor will operate the vending facility. As such, the vendor must exercise control or management over the functioning of the vending facility as a whole, not merely exercise control or management over tasks performed in support of the facility's functioning. The Fort Riley DFA contract is limited to janitorial and custodial duties such as cleaning, trash removal, and dishwashing. These duties are discrete tasks performed in support of the facility's functioning; they do not involve control or management over the facility's functioning as a whole and thus do not constitute operation of the vending facility. The performance of such services is thus insufficient to trigger the RSA's preference, which applies by its terms only to "the operation of vending facilities."[15]

The meaning of "operate" in other parts of the RSA supports this conclusion.[16] For it is well settled that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The RSA uses "operation" and "operated" in a number of provisions other than those creating a preference for blind vendors,

---

[14] 20 U.S.C. § 107(b) (emphasis added).

[15] 20 U.S.C. § 107(b).

[16] Although the RSA does not define "operation," the meaning of the term in other parts of the RSA supports the conclusion that the RSA's preference applies only where vendors exercise control or management over the functioning of the vending facility as a whole.

and some of these references make sense only if "operate" is interpreted to mean the blind vendor will exercise control or management over the functioning of the vending facility as a whole and not merely perform discrete tasks in support of the vending facility's functioning. For example, the RSA provides that "no department, agency, or instrumentality of the United States shall undertake to acquire . . . any building unless . . . it is determined by the Secretary that . . . such building includes a satisfactory site or sites for the location and operation of a vending facility by a blind person." 20 U.S.C. § 107a(d)(1). And the RSA provides an exception to this requirement where, among other things, "the operation of such a vending facility by a blind person would be in proximate and substantial direct competition with" an existing "restaurant or other food facility." § 107a(d)(2). Furthermore, the RSA defines "vending facility" as "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment as the Secretary may by regulation prescribe as being necessary for the sale of articles or services . . . and which may be operated by blind licensees." § 107e. These provisions only make sense if "operation" and "operated" are interpreted to mean the blind vendor exercises control or management over the functioning of the vending facility as a whole and not merely over ancillary services in support of the facility's functioning. Because identical words that appear in different places in a single statute should ordinarily be presumed to have the same meaning, the RSA's preference applies only where blind vendors exercise control or management over the functioning of the vending facility as a whole.

Finally, the regulations issued pursuant to the RSA support this interpretation because they imply that the blind vendor's operation of the vending facility must involve control or management over food—a requirement consistent with application of the RSA's preference only where vendors will exercise control or management over the functioning of the vending facility as a whole, not

merely perform discrete tasks in support of the facility's functioning.[17] Specifically, the regulations provide that "[p]riority in the operation of cafeterias by blind vendors . . . shall be afforded when the Secretary determines . . . that such operation can be provided at a reasonable cost, with food of a high quality." 34 C.F.R. 395.33(a). The DOE thus contemplates that the blind vendor's "operation" of the cafeteria will involve food. Similarly, the regulations invite state licensing agencies to respond to federal contract solicitations "[i]n order to establish the ability of blind vendors to operate a cafeteria in such manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services." *Id.* § 395.33(b). The regulation's implication—that "operation" of dining facilities must involve control or management over food—is consistent with the plain language interpretation that the RSA's preference applies only where a vendor exercises control or management over the functioning of a dining facility as a whole and not merely where a vendor performs discrete tasks in support of the functioning of a dining facility. Because the Fort Riley DFA contract involves only sanitation and other janitorial services, it consists only of discrete tasks performed to support the functioning of Fort Riley dining facilities and does not entail control or management over the functioning of the dining facilities as a whole. As such, the RSA's preference does not apply.

The arbitration panel erroneously concluded that the RSA's preference applies to the Fort Riley DFA contract because it had an unduly broad view of the scope of the preference. Specifically, the panel majority concluded that the RSA's preference applies "[w]here the tasks to be performed by a contract for DFA services includes [sic] tasks that constitute an integral element

---

[17] Unlike the arbitration panel's findings, the DOE's regulations are entitled to deference. *Chevron* deference applies "only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). The RSA expressly delegates the authority to promulgate regulations to the DOE. *See* 20 U.S.C. § 107d-3(e).

of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria, or tasks that without which the cafeterias would not be able to function."[18] Final Arbitration Decision 31 (May 9, 2017), at Admin. R. 1765. The panel reached this conclusion by relying on a regulation that did not purport to define the scope of the RSA's preference. Specifically, the panel relied on a regulation requiring the renegotiation of contracts "pertaining to the operation of cafeterias on Federal property . . . pursuant to the provisions of this section" following the regulation's effective date. 34 C.F.R. § 395.33(c). The panel concluded, and the intervenor now argues, that this regulation establishes that the RSA's preference applies to any contract that pertains to the operation of vending facilities. It does not. Indeed, another regulation explicitly defines the scope of the RSA's preference; it states that "[p]riority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines . . . that such operation can be provided at a reasonable cost, with food of a high quality." *Id.* § 395.33. Moreover, the regulation on which the panel and intervenor rely, although entitled to deference, may not override the statutory text or broaden the scope of the RSA's preference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984). The RSA is explicit that its preference applies only to "the operation of vending facilities," not to any contract that pertains to the operation of vending facilities. 20 U.S.C. § 107(b). Moreover, it does not even appear that the DOE sought to broaden the scope of the RSA through this regulation. The regulation on which the panel relied compels renegotiation of contracts "pertaining to the operation of cafeterias on Federal property . . . pursuant to the provisions of this section." *Id.* It thus explicitly contemplates that all such renegotiations are to comply with the RSA's other regulations, including the regulation

---

[18] As discussed *supra*, the arbitration panel's interpretation of the RSA is not entitled to deference "because the [RSA] does not delegate interpretive authority to the arbitration panel; instead, it gives the Secretary of Education the responsibility of administering the Act and issuing interpretive regulations. *See* 20 U.S.C. § 107(b)." *Sauer v. Dep't of Educ.,* 668 F.3d 644, 650 (9th Cir. 2012).

specifying when the preference applies: "[p]riority *in the operation of cafeterias* by blind vendors on Federal property shall be afforded when . . . ." *Id.* § 395.33(a) (emphasis added). Indeed, the DOE agrees that the arbitration panel had an unduly broad view of the scope of the RSA's preference. Accordingly, the panel's interpretation of the scope of the RSA's preference is contrary to the statutory text and finds no support in the regulation on which the panel claims it relied.

Intervenor argues that a letter from the Secretary to a member of Congress supports its position and compels the conclusion that the RSA's preference applies to the Fort Riley DFA contract.[19] Intervenor is incorrect; the letter is neither entitled to deference[20] nor does it represent the DOE's position with respect to this litigation or the Fort Riley DFA contract generally. The DOE has unequivocally stated its litigation position that the RSA does not apply to the Fort Riley DFA contract. And counsel for the DOE represents that the DOE, through its General Counsel, stated that, apart from this litigation, the DOE has not adopted any position regarding the application of the RSA to the Fort Riley DFA contract and that the Secretary's letter did not adopt any such position.

Intervenor correctly notes that the Fourth Circuit has held that when both the RSA and the JWOD "appear to apply," the RSA must control because it is the more specific statute. *NISH v. Cohen,* 247 F.3d 197, 204–05 (4th Cir. 2001). However, that instruction is inapplicable here. The RSA does not "appear to apply" to the Fort Riley DFA contract. To the contrary, it is clear that the RSA's preference does not apply to the Fort Riley DFA contract. The contract is for sanitation and

---

[19] The letter states, in part, that "The Education Department believes that the [RSA] priority applies to both types of cafeteria contracts"—namely, FFS and DFA contracts. Letter from Secretary of Education Betsy DeVos to Representative Pete Sessions (March 5, 2018).

[20] *Chevron* deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *United States v. Mead Corp.,* 533 U.S. 218, 226–27 (2001). Intervenor cannot credibly argue that a letter written by the Secretary to a congressman constitutes an agency interpretation promulgated in the exercise of the authority to make rules carrying the force of law.

janitorial services. Such services are ancillary and support the operation of a vending facility; they do not constitute the operation of a vending facility, as is required for the RSA's preference to apply. Accordingly, the arbitration panel erroneously concluded that the Fort Riley DFA contract is subject to the RSA's preference, and the APA requires that this agency action be set aside because it is "not in accordance with law." 5 U.S.C. § 706(2)(A); *Sauer*, 668 F.3d at 650.

**B.**

Plaintiffs and defendants argue that the arbitration decision was also contrary to the RSA because the panel erroneously concluded that the Army violated the RSA Review Requirement. This argument fails. Although the RSA's preference does not apply to the Fort Riley DFA contract, the RSA Review Requirement obligated the Army to justify its decision to terminate the operation of vending facilities at Fort Riley by vendors to the Secretary in writing. *See* 20 U.S.C. § 107(b). The arbitration panel correctly concluded that the Army failed to comply with this requirement.

The RSA Review Requirement directs that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified." *Id.* Plaintiffs and defendants argue that the Army's decision to no longer procure a contract for the operation of its vending facilities at Fort Riley did not trigger this provision because it does not constitute a "limitation on the . . . operation of a vending facility."[21] *Id.* Specifically, plaintiffs and defendants argue that the RSA Review Requirement applies only to restrictions on where or how a vending facility may be operated. This argument fails. Under the Army's plan, the operation of Fort Riley dining facilities was to be

---

[21] It is puzzling that the RSA requires the Army to justify to the Secretary of Education the Army's decision to use Army cooks in its dining facilities. The wisdom of this requirement, however, is not at issue.

limited in that the facilities would not be operated by a vendor at all. Removing a vendor entirely is the most basic limitation on the operation of vending facilities of all. Indeed, the legislative history confirms this view. Specifically, the Senate Report explains that the RSA Review Requirement was added, in part, because "[f]ederal agencies had not done all they could to insure the establishment *and the maintenance* of blind vendors on property under their control."[22] S. Rep. No. 93-937, at 16 (1974) (emphasis added). This concern—that federal agencies were not doing all they could to ensure blind vendors continued to operate dining facilities—is directly implicated by the Army's decision to cease contracting with vendors for the operation of its dining facilities. Indeed, it is the exact scenario that motivated the Senate to add the review provision. As such, the arbitration panel correctly concluded that the Army's decision to discontinue the operation of its vending facilities by a vendor triggered the RSA Review Requirement. And the arbitration panel correctly concluded that the Army failed to comply with this requirement. The panel's finding to this effect must be upheld.

## C.

Plaintiffs and defendants next argue that the arbitration panel erroneously concluded that the Army violated the JWNDA No-Poaching Provision when it worked with the Commission to place services formerly performed by an RSA vendor on the JWOD's procurement list. Intervenor disagrees. Because plaintiffs and defendants are correct that the arbitration panel incorrectly found that the Army violated the JWNDA No-Poaching Provision, that finding must be set aside as "not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[22] The Senate Report explained that the RSA Review Requirement was also added because "certain Federal agencies were charged with imposing arbitrary and harmful limitations on blind vendor operations with respect to the kinds of merchandise a blind vendor was permitted to sell, with respect to the location of blind stand [sic], or with respect to the amount of income permitted to accrue to a vendor." S. Rep. No. 93-937, at 16 (1974).

The JWNDA No-Poaching Provision provides, as relevant here, that the RSA "does not apply to full food services, mess attendant services, or services supporting the operation of a military dining facility that, as of the date of the enactment of this Act, were services on the procurement list established under" the JWOD. Pub. L. No. 109-364, § 856(a)(1). It seems the arbitration panel concluded the JWNDA No-Poaching Provision's instruction that the RSA "does not apply to . . . services supporting the operation of a military dining facility that, as of the date of the [JWNDA's] enactment . . . , were services on the [JWOD's] procurement list" implies that the RSA applies to all other services supporting the operation of a military dining facility. *Id.* This conclusion is flawed because the JWNDA No-Poaching Provision did not expand the reach of the RSA and it is of limited value in interpreting the RSA's preference.[23]

The JWNDA No-Poaching Provision did not expand the reach of the RSA. Rather, the provision curtailed the reach of the RSA and the JWOD in an attempt to avoid conflicts between them. The provision specifies that the RSA does not apply in particular circumstances. Indeed, the JWNDA No-Poaching Provision is titled "INAPPLICABILITY OF CERTAIN LAWS." *Id.* at § 856(a). It thus cannot fairly be read as expanding the scope of the RSA's preference.

Nor does the JWNDA No-Poaching Provision shed much light on the meaning of the RSA. "[S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress." *United States v. Texas*, 507 U.S. 529, 535 n.4 (internal quotation marks and citation omitted). And, even if such intent could be inferred, the provision does not imply what that the panel seems to think it does. In particular, the JWNDA's instruction that the RSA "does not apply to . . . services supporting the operation of a military dining facility that. . . were services on the

---

[23] Moreover, it is not entirely clear what the panel meant when it concluded that the Army violated the JWNDA No-Poaching Provision by working with the Commission to place the Fort Riley DFA contract on the procurement list. It is difficult to understand how a provision that limits the RSA's applicability can be violated by a decision to procure services without using the RSA.

[JWOD's] procurement list" at the time of the JWNDA's enactment does not imply that the RSA applies to all other services supporting the operation of a military dining facility. Pub. L. No. 109-364, § 856(a)(1). A contrary conclusion would fly in the face of the RSA's text, which expressly stipulates that the RSA's preference applies to "the operation of vending facilities." 20 U.S.C. § 107(b). Moreover, the second part of the JWNDA No-Poaching Provision confirms this view. Specifically, the provision further provides that the JWOD "does not apply at the prime contract level to any contract entered into by the [DOD] as of the date of the enactment of this Act with a State licensing agency under the [RSA] for the operation of a military dining facility." Pub. L. No. 109-364, § 856(a)(2). Surely neither the panel nor intervenor would argue that this implies that all contracts for the operation of a military dining facility other than those in effect under the RSA at the time of the JWNDA's enactment are subject to the JWOD. The ridiculousness of this conclusion—ridiculous because the RSA expressly applies in such circumstances—underscores that the other part of the JWNDA No-Poaching Provision too lacks the implication the arbitration panel apparently believed it contained. Rather, the JWNDA No-Poaching Provision does exactly what it says; it clarifies that services supporting the operation of military dining facilities that were on the JWOD's procurement list when the JWNDA was enacted are not subject to the RSA. It does not include or invite the inference that all such services not on the JWOD's procurement list at the time are covered by the RSA.

Because the JWNDA neither expanded the scope of the RSA's preference nor revealed the proper interpretation of the RSA, the arbitration panel erred when it found that the Army violated the JWNDA No-Poaching Provision when it worked with the Commission to put the Fort Riley DFA services on the procurement list. Accordingly, that finding must be set aside as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## D.

Plaintiffs argue that the arbitration decision must also be set aside as "not in accordance with law" because it violates the JWOD. *Id.* Specifically, plaintiffs argue that the JWOD requires that the Fort Riley DFA services be obtained pursuant to that Act because the services were on the JWOD's procurement list. Plaintiffs contend that the panel violated this requirement when it found that the Fort Riley DFA contract was subject to the RSA's preference. Defendants respond that there is no basis for ruling on the applicability of the JWOD in this action for judicial review of the RSA arbitration decision. Defendants are correct.

There is no basis for ruling on the applicability of the JWOD to the Fort Riley DFA contract because the JWOD, and its applicability to the Fort Riley DFA contract, was not at issue in the arbitration. Indeed, the panel did not have authority to make any findings regarding the JWOD or its applicability to the Fort Riley DFA contract. *See* 20 U.S.C. § 107d-2(b)(2); *Md. Dep't of Educ. v. Dep't of Veterans Affairs*, 98 F.3d 165, 169 (4th Cir. 1996). The arbitration panel was authorized only to determine whether the Army violated the RSA or its regulations. *See* 20 U.S.C. § 107d-2(b)(2); *Md. Dep't of Educ.*, 98 F.3d at 169. Because the applicability of the JWOD was not at issue in the arbitration, there is no basis for considering it here.

This is especially so because the conclusion reached here—namely, that the Fort Riley DFA contract is not subject to the RSA's preference—cures the alleged JWOD violation. Plaintiffs allege that the arbitration panel violated the JWOD when it concluded the Fort Riley DFA contract was subject to the RSA's preference despite the inclusion of the Fort Riley DFA services on the JWOD's procurement list. The panel's finding that the Fort Riley DFA contract is subject to the RSA's preference is erroneous and must be set aside. As such, the alleged JWOD violation is

cured, and it is unnecessary to consider the applicability of the JWOD to the Fort Riley DFA

contract.

E.

Plaintiffs next argue that the arbitration decision must be set aside because intervenor

engaged in *ex parte* communications with the panel during the arbitration proceeding in violation

of § 557 of the APA. *See* 5 U.S.C. § 557(d)(1). However, this claim may not be addressed because

it is not properly raised in plaintiffs' Complaint.[24] The Fourth Circuit has made clear that plaintiffs

may not raise new claims after discovery has begun without amending their complaint. *See*

*Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009). Plaintiffs did not amend their

Complaint to include a claim that the arbitration proceeding violated § 557.[25] As such, the claim

may not be considered.

---

[24] Plaintiffs argue that the claim is properly raised because the Complaint notes, in a section titled "introduction," that the arbitration panel's dissenter "concluded . . . that the arbitration proceedings lacked fundamental fairness—citing the wholesale exclusion of relevant testimony from SourceAmerica and Lakeview and the Army's concerns about 'the Panel Chair's judgment, neutrality, and ability to assure a fair hearing." Pls.' Compl. at 1, 4 (internal quotation marks and citation omitted). And in a section titled "procedural history," the Complaint alleges that "the Army requested a new hearing citing several concerns regarding the fundamental fairness of the arbitration proceeding . . . as well as the Panel Chair's judgment, neutrality, and ability to assure a fair hearing." *Id.* at 17, 26 (internal quotation marks and citation omitted). These references are insufficient to raise a claim that § 557 of the APA was violated. Plaintiffs included these two references in sections titled "introduction" and "procedural history" and did not raise a § 557 claim in the Complaint's various counts or prayer for relief. Moreover, the Complaint does not cite § 557 or refer to its requirements. Plaintiffs also argue that the Complaint included a § 557 claim because the Army's request for a new hearing, which included charges of procedural unfairness, was appended to the Complaint. This argument also fails; plaintiffs attached twenty-eight exhibits to their Complaint. That one of those exhibits included allegations of the conduct plaintiff now wishes to challenge is insufficient.

[25] In their summary judgment briefing, plaintiffs represent that they will seek leave to amend their Complaint if necessary. This attempt—which comes too late—would be futile, as § 557 of the APA does not apply to RSA arbitration proceedings. *See United States v. Fl. E. Coast R. Co.*, 410 U.S. 224, 236–38 (1973). Section 557 of the APA applies only when the agency proceedings are "required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. §§ 554(a), 556(a), 557(a). Although the RSA provides that the arbitration panel shall "conduct a hearing," the Supreme Court has held that a statutory provision that merely calls for "a hearing" does not trigger § 557. *Fl. E. Coast R. Co.*, 410 U.S. at 237. As such, plaintiffs' proposed amendment would be futile because § 557's prohibition on *ex parte* communications does not apply to RSA arbitrations.

**F.**

Plaintiffs next argue that the arbitration panel violated § 555(b) of the APA by preventing plaintiffs from participating in the arbitration proceeding. *See* 5 U.S.C. § 555(b). Section 555(b) of the APA provides that "[s]o far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request or controversy in a proceeding." *Id.* Intervenor argues that the panel did not violate this provision because plaintiffs lacked standing to intervene in the RSA arbitration. This argument fails because plaintiffs were clearly "interested persons" within the meaning of § 555(b). Defendants admit that the panel violated § 555(b) by refusing to allow plaintiffs to participate in the arbitration proceeding but argue this error was harmless. It was not.

Intervenor argues that plaintiffs lacked standing to intervene in the RSA arbitration because the panel was limited to determining the applicability of the RSA to the Fort Riley DFA contract and could not rule on the applicability of the JWOD. Although intervenor is correct that the arbitration panel's authority was limited in this way, plaintiffs were nonetheless "interested person[s]" with respect to the arbitration proceeding and thus entitled to appear before the panel "[s]o far as the orderly conduct of public business permit[ted]." *Id.* Lakeview was placed on the procurement list as the mandatory source of supply for the Fort Riley DFA services, and a determination by the arbitration panel that the Fort Riley DFA services must be procured pursuant to the RSA would jeopardize the value of that placement. The arbitration proceeding thus had the potential to—and, ultimately, did—deprive Lakeview of a contract that it expected to receive. As such, plaintiffs were "interested person[s]" with respect to the RSA arbitration, and § 555(b) granted them a right to appear before the panel "[s]o far as the orderly conduct of public business permit[ted]." *Id.*

Defendants, although admitting that the arbitration panel erred by failing to allow plaintiffs to appear before the panel pursuant to § 555(b), argue that the error was harmless. This argument also fails. To be sure, "[a]dministrative adjudications are subject to the same harmless error rule that generally applies to civil cases." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016). As such, "[r]eversal on account of error is not automatic but requires a showing of prejudice." *Id.* Determining whether an error was prejudicial requires consideration of "the facts and circumstances of the particular case." *Id.* at 254. Factors include "the likelihood that the result might have been different, as well as how the error might impact the public perception of such proceedings." *Id.* at 254 (internal quotation marks and citation omitted). Defendants argue the error here was harmless because plaintiffs could not have changed the outcome of the proceeding, as plaintiffs would have made the same legal arguments about the application of the RSA and the JWOD that the Army made. This argument is unpersuasive because—as the Army itself has admitted—the Army was not permitted to introduce evidence about the application of the RSA and JWOD that it considered material, and plaintiffs may have successfully admitted this evidence. The evidence consisted of testimony by two witnesses employed by plaintiffs and a third witness employed by the Commission. Indeed, the Army requested a new hearing in part because the panel refused to hear this evidence. The Army cannot now plausibly argue that the panel's failure to allow plaintiffs' participation was harmless given its prior position that the panel's exclusion of "material" testimony by plaintiffs' employees caused the Army to "suffer[] prejudice when it was not allowed to offer their testimony at the hearing." Dep't of the Army's Post-Arbitration Br. & Request for New Hearing 3–4 (Feb. 17, 2017), at Admin. R. 1584–85.

The prejudicial nature of the error is further evidenced by its likely impact on public perception of the arbitration. The Fourth Circuit has instructed that "how the error might impact

the public perception of [the] proceedings" should be considered when assessing whether an error is prejudicial. *Sea "B" Mining Co.*, 831 F.3d at 254. The error here likely negatively impacted public perception of the arbitration. The panel refused to allow plaintiffs to participate even though the arbitration had the potential to eliminate Lakeview's chances of receiving a contract for services for which it had been designated as the mandatory source of supply. This created a perception of unfairness that was magnified by the panel's refusal to allow one of Lakeview's employees to testify for the Army despite the panel's pre-arbitration determination that the witness was essential to the Army's defense and thus the DOE should pay his travel costs. The panel's error was thus likely to have a negative impact on public perception of the arbitration, including the proceeding's fairness. For these reasons, the harmless error rule—which the Fourth Circuit has explained "is not . . . a particularly onerous requirement"—is clearly satisfied here. *Id.* at 253 (internal quotation marks and citation omitted). As such, defendants' argument to the contrary must be rejected. The arbitration panel violated § 555(b) when it refused to allow plaintiffs to participate in the proceeding without articulating why "the orderly conduct of public business [did not] permit[]" their participation. 5 U.S.C. § 555(b).

### G.

Finally, plaintiffs argue that defendants violated the Fifth Amendment by adjudicating plaintiffs' protected property interests during the arbitration without procedural protections. However, this constitutional claim need not be addressed here given the "duty [of courts] to avoid deciding constitutional questions presented unless essential to proper disposition of a case." *Harmon v. Brucker*, 355 U.S. 579, 581 (1958). Plaintiffs' constitutional claim has the same premise as plaintiffs' § 555(b) claim—namely, the panel's refusal to allow plaintiffs to participate

in the arbitration. Plaintiffs have successfully established that § 555(b) was violated, and this violation precludes the necessity of addressing plaintiffs' constitutional claim to the same effect.

## VI.

The final issue remaining is the proper remedy. Plaintiffs request vacation of the arbitration decision, issuance of a declaratory judgment finding that the Fort Riley DFA services are beyond the scope of the RSA and covered instead by the JWOD, and a permanent injunction preventing defendants from implementing or enforcing the arbitration decision. Defendants contend that the proper remedy is a finding that the arbitration panel erred and remand for a corrected decision.[26] Both are incorrect. Plaintiffs cannot satisfy the requirements for equitable relief, and remand to the arbitration panel is unnecessary. Rather, the proper remedy is to vacate the arbitration panel's decision in part as "not in accordance with law." 5 U.S.C. § 706(2)(A).

The arbitration panel's decision must be vacated in part and affirmed in part, consistent with the above findings. In particular, the panel's finding that the Fort Riley DFA contract was subject to the RSA's preference must be vacated because, as explained *supra*, that ruling is not in accordance with law. Therefore, the panel's finding that the Army violated the RSA when it failed to apply that preference must also be vacated as not in accordance with law. Similarly, the panel's finding that the Army violated the JWNDA No-Poaching Provision when it worked with the Commission to place services formerly performed by an RSA vendor on the JWOD's procurement list must be vacated as not in accordance with law because the Army's actions did not violate the JWNDA No-Poaching Provision. However, the panel's finding that the Army violated the RSA

---

[26] Defendants, of course, argue first that the case should be dismissed without reaching the merits, but that argument fails for the reasons discussed *supra*.

Review Requirement must be upheld because the Army did indeed violate the RSA Review Requirement. Further relief beyond these findings is inappropriate.

Equitable relief is inappropriate because plaintiffs have not shown any real or immediate threat that they will be wronged again. Equitable relief is proper only where there is "a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Plaintiffs have not established such a "real or immediate threat that [they] will be wronged again." *Id.* Indeed, there is every reason to believe that plaintiffs will not be wronged again. The Army initially took the position that the RSA's preference did not apply to the Fort Riley DFA contract and vigorously defended that position during the arbitration. Although the Army complied with the arbitration panel's finding that the RSA's preference applies to the contract, the Army has consistently maintained throughout this litigation that the panel's finding was incorrect. As such, there is no reason to believe that the Army will respond to vacation of the arbitration panel's decision by continuing to apply the RSA's preference to the Fort Riley DFA contract. Accordingly, plaintiffs have failed to establish that they face a real and immediate threat of future harm, and equitable relief is thus inappropriate.

Remand, although often appropriate when an agency committed an error of law, is not appropriate here. Remand is the proper remedy when an agency has been vested with discretion and judicial review leaves open issues that the agency may resolve using that discretion on remand. *See N.L.R.B. v. Food Store Emp. Union, Local 347*, 417 U.S. 1, 10 (1974) ("[W]hen a reviewing court concludes that an agency invested with broad discretion to fashion remedies has apparently abused that discretion . . . , remand to the agency for reconsideration . . . is ordinarily the reviewing court's proper course."). The arbitration panel has been vested with no such discretion

here. Indeed, the arbitration panel has the authority to determine only whether the RSA or its regulations have been violated. 20 U.S.C. § 107d-2(b)(2); *Md. Dep't of Educ. v. Dep't of Veterans Affairs,* 98 F.3d 165, 169 (4th Cir. 1996). If the panel finds such a violation, it may not fashion a remedy; the head of the federal department, agency, or instrumentality is responsible for remedying the violation. § 107d-2(b)(2); *Md. Dep't of Educ.,* 98 F.3d at 169. This Opinion concludes that the panel correctly found that the RSA Review Requirement was violated but incorrectly concluded that the RSA's preference applies to the Fort Riley DFA contract and that the JWNDA No-Poaching Provision was violated. As such, whether the RSA or its regulations were violated has been conclusively determined, and the arbitration panel lacks authority to do anything else. Remand is thus inappropriate.[27]

Accordingly, and for the reasons discussed above, plaintiffs' Motion for Summary Judgment must be granted in part and denied in part; defendants' Motion for Summary Judgment must be granted in part and denied in part; and intervenor's Motion for Summary Judgment must be granted in part and denied in part. The arbitration findings that (i) the Fort Riley DFA contract is subject to the RSA's preference, (ii) the Army violated the RSA when it failed to apply the RSA's preference to the Fort Riley DFA contract, and (iii) the Army violated the JWNDA No-Poaching Provision must be vacated. The arbitration finding that Army violated the RSA Review Requirement must be affirmed. The Army is free to procure a contract for the Fort Riley DFA services consistent with this Opinion.

---

[27] Nor is remand necessary for the arbitration panel to determine whether plaintiffs are entitled to appear before the panel pursuant to § 555(b) or whether the "the orderly conduct of public business" does not permit this appearance. 5 U.S.C. § 555(b). Certainly, the proper remedy for a § 555(b) violation ordinarily is remand for the agency to consider the requested appearance. However, remand would be fruitless here. There is nothing for the arbitration panel to decide on remand apart from whether plaintiffs should be permitted to make an appearance. Plaintiffs have attacked the arbitration panel's conclusions on the merits. These challenges have been resolved, many in plaintiffs' favor, and there is nothing more for the panel to decide. Remand to allow the panel to consider whether plaintiffs may appear before it when there are no outstanding merits issues for the panel to decide would be futile.

An appropriate Order will issue.


Alexandria, Virginia
March 15, 2019

T. S. Ellis, III
United States District Judge